STUART F. DELERY
Assistant Attorney General
JOHN R. TYLER
Assistant Branch Director
LYNN Y. LEE (CA Bar 235531)
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, DC 20530
(202) 305-0531
(202) 616-8470 (fax)
lynn.lee@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, ASIAN LAW CAUCUS, SAN FRANCISCO BAY GUARDIAN<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, DEPARTMENT OF JUSTICE,<br><br>Defendants. | Case No. 3:10-cv-03759-RS<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Date: TBD<br>Time: TBD<br>Courtroom 3<br>Hon. Richard Seeborg |

PLEASE TAKE NOTICE that defendant the Federal Bureau of Investigation, Department of Justice, respectfully moves for summary judgment in this action pursuant to Fed. R. Civ. P. 56. This motion is based on the accompanying Memorandum of Points and Authorities.

Date: Sept. 9, 2014                    By:  */s/Lynn Y. Lee*
                                            Lynn Y. Lee

                                       STUART F. DELERY
                                       Assistant Attorney General
                                       JOHN R. TYLER
                                       Assistant Branch Director
                                       LYNN Y. LEE
                                       Trial Attorney
                                       U.S. Department of Justice, Civil Division
                                       Federal Programs Branch
                                       P.O. Box 883
                                       Washington, DC 20530
                                       (202) 305-0531
                                       (202) 616-8470 (fax)
                                       lynn.lee@usdoj.gov

                                       *Attorneys for Defendants*

1  STUART F. DELERY
   Assistant Attorney General
2  JOHN R. TYLER
   Assistant Branch Director
3  LYNN Y. LEE (CA Bar 235531)
   Trial Attorney
4  U.S. Department of Justice
   Civil Division
5  Federal Programs Branch
   P.O. Box 883
6  Washington, DC 20530
   (202) 305-0531
7  (202) 616-8470 (fax)
   lynn.lee@usdoj.gov
8
   Attorneys for Defendants
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12
   THE AMERICAN CIVIL LIBERTIES UNION          Case No. 3:10-cv-03759-RS
13 OF NORTHERN CALIFORNIA, ASIAN LAW
   CAUCUS, SAN FRANCISCO BAY
14 GUARDIAN                                     **MEMORANDUM IN SUPPORT OF
                                                MOTION FOR SUMMARY
                      Plaintiffs,               JUDGMENT**
15
16           v.                                 Date: TBD
                                                Time: TBD
17 FEDERAL BUREAU OF INVESTIGATION,             Courtroom 3
   DEPARTMENT OF JUSTICE,                       Hon. Richard Seeborg
18
                      Defendants.
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................1

LEGAL STANDARD.........................................................................................................4

ARGUMENT .....................................................................................................................4

I.      The FBI Conducted an Adequate Search Reasonably Calculated to
        Uncover All Responsive Documents ...................................................................4

        A.      Plaintiffs' March 2010 Request ...........................................................5

        B.      Plaintiffs' July 2010 Requests .............................................................9

II.     The FBI's Withholdings Were Proper Under the FOIA's Exemptions.............9

        A.      The FBI Properly Withheld Records Pursuant to Exemption (b)(2) ....................10

        B.      The FBI Properly Withheld Records Pursuant to Exemption (b)(5) ....................11

        C.      The FBI Properly Withheld Records Pursuant to Exemption (b)(7) ....................12

                1.      Exemption (b)(7)(A) ...............................................................13

                2.      Exemption (b)(7)(D) ...............................................................14

                3.      Exemption (b)(7)(E)................................................................15

III.    The FBI Has Produced All Reasonably Segregable Portions of
        Responsive Records ...........................................................................................17

CONCLUSION.................................................................................................................17

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Security,*
    626 F.3d 678 (2d Cir. 2010) ................................................................................15

*Asian Law Caucus v. Dep't of Homeland Security,*
    2008 WL 5047839 (N.D. Cal. Nov. 24, 2008) .........................................................15, 17

*Brennan Ctr. for Justice v. Dep't of Justice,*
    697 F.3d 184, 207 (2d. Cir. 2012) ......................................................................11

*CIA v. Sims,*
    471 U.S. 159 (1985) ........................................................................................9

*Church of Scientology Int'l v. IRS,*
    995 F.2d 916 (9th Cir. 1993) ............................................................................12

*Citizens Comm'n on Human Rights v. FDA,*
    45 F.3d 1325 (9th Cir. 1995) ............................................................................4

*Durrani v. Dep't of Justice,*
    607 F. Supp. 2d 77 (D.D.C. 2009) ....................................................................15

*Dep't of Air Force v. Rose,*
    425 U.S. 352 (1976) ........................................................................................9

*Dow Jones & Co. v. Dep't of Justice,*
    917 F.2d 571 (D.C. Cir. 1990) ..........................................................................14

*Hickman v. Taylor,*
    329 U.S. 495 (1947) ........................................................................................11

*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.),*
    357 F.3d 900 (9th Cir. 2004) ............................................................................11

*John Doe Agency v. John Doe Corp.,*
    493 U.S. 146 (1989) ......................................................................................10, 13

*Lahr v. Nat'l Transp. Safety Bd.,*
    569 F.3d 964 (9th Cir. 2009) ............................................................................4

*Lawyers Comm. for Civil Rights v. Dep't of the Treasury,*
    534 F. Supp. 2d 1126 (N.D. Cal. 2008) ..............................................................4

*Lion Raisins v. Dep't. of Agric.*,
    354 F.3d 1072 (9th Cir. 2004) .......................................................................10

*Mapother v. Dep't of Justice*,
    3 F.3d 1533 (D.C. Cir. 1993) ........................................................................12

*Maricopa Audubon Soc'y v. U.S. Forest Serv.*,
    108 F.3d 1089 (9th Cir. 1997) .....................................................................11

*Milner v. Dep't of Navy*,
    131 S. Ct. 1259 (2011) .................................................................................10

*Minier v. CIA*,
    88 F.3d 796 (9th Cir. 1996) .........................................................................10

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) .....................................................................................13

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ................................................................................11, 12

*PHE, Inc. v. Dep't of Justice*,
    983 F.2d 248 (D.C. Cir. 1993) ......................................................................16

*Rosenfeld v. Dep't of Justice*,
    57 F.3d 803 (9th Cir. 1995) .........................................................................13

*Shannahan v. IRS*,
    672 F.3d 1142 (9th Cir. 2012) .....................................................................10

*Span v. Dep't of Justice*,
    696 F. Supp. 2d 113 (D.D.C. 2010) ..............................................................15

*Dep't of Justice v. Landano*,
    508 U.S. 165 (1993) .....................................................................................14

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir.1973) ................................................................ <u>passim</u>

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ......................................................................10

*Yonemoto v. Dep't of Veterans Affairs*,
    686 F.3d 681 (9th Cir. 2012) ..........................................................................4

## STATUTES

5 U.S.C. § 552(a)(4)(B) ...........................................................................................4
5 U.S.C. § 552(b) ......................................................................................... <u>passim</u>

## RULES AND REGULATIONS

28 C.F.R. § 16.1 ...................................................................................................4

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 26(b)(3)........................................................................................11
Fed. R. Civ. P. 56................................................................................................1, 4

**INTRODUCTION**

This action arises out of a series of Freedom of Information Act ("FOIA") requests submitted by plaintiffs the American Civil Liberties Union, Asian Law Caucus, and San Francisco Bay Guardian (collectively "plaintiffs") to the Federal Bureau of Investigation ("FBI") in 2010. Plaintiffs seek "records concerning the investigation and surveillance of Muslim communities in northern California" from FBI headquarters and FBI field offices in San Francisco, and Sacramento, and "records concerning the collection and use of racial and ethnic data in northern California" from the FBI's San Francisco and Sacramento offices. Amended Compl. (ECF No. 39) ¶¶ 2-3 and Exhibits A, B (ECF Nos. 39-1, 39-2).

As demonstrated below and in the attached declaration of David M. Hardy, Section Chief of the Record/Information Dissemination Section, Records Management Division of the FBI ("RIDS"), the FBI conducted extensive and thorough searches to identify documents responsive to plaintiffs' requests. The FBI released all reasonably segregable information that is subject to FOIA and responsive to plaintiffs' request, withholding only documents or portions of documents that are covered by the statutory exemptions. Plaintiffs now challenge the FBI's search for records and its withholdings, asking the Court to order the release of sensitive national security and law enforcement information, including information regarding the FBI's intelligence and counterintelligence activities and its investigative techniques, methods, and procedures. However, release of this information would undermine the FBI's efforts to investigate violations of federal criminal and national security laws and to protect the United States from domestic and foreign threats. Such was not the intent of Congress in enacting FOIA. Accordingly, the Court should enter summary judgment in favor of the government pursuant to Fed. R. Civ. P. 56.

**BACKGROUND**

On March 12, 2010, the FBI received a FOIA request dated March 9, 2010 from plaintiffs for information regarding the alleged investigation and surveillance of Muslim communities in northern California. The request was further subdivided into no fewer than thirty-three (33) subparts of related information and aggregate data. In addition, the plaintiffs requested expedited processing and a waiver of all fees. Declaration of David M. Hardy ("Hardy Decl.") ¶ 5 and

Exhibit A. The FBI acknowledged the request, granted plaintiffs' requests for fee waiver and expedited status, and advised plaintiffs that a search for responsive records was being conducted. Hardy Decl. ¶¶ 6-7 and Exhibits B-E. On June 15 and again on September 20, 2010, the FBI sent status letters advising plaintiffs that it was still searching for, retrieving, and evaluating files that could be potentially responsive to their request. Hardy Decl. ¶ 8 and Exhibits F, G. In the interim, plaintiffs filed the instant lawsuit involving this request on August 24, 2010. ECF No. 1; Hardy Decl. ¶ 11.

By letter dated July 27, 2010, plaintiffs submitted additional FOIA requests to the FBI's San Francisco Field Office ("SFFO") and Sacramento Field Office ("SCFO") requesting information concerning the "FBI's implementation of its authority to collect information about and 'map' racial and ethnic demographics, 'behaviors,' and 'life style characteristics' in local communities in order to assist the FBI's 'domain awareness' and 'intelligence analysis' activities" within Northern California, along with a request for fee waiver. Hardy Decl. ¶ 9 and Exhibit H. The FBI acknowledged receipt of these requests on August 6, 2010. Hardy Decl. ¶ 10 and Exhibit I. By letters dated November 4, 2010, the FBI informed plaintiffs that it was searching for documents potentially responsive to their requests and analyzing any documents located to determine responsiveness. Hardy Decl. ¶ 12 and Exhibit J. On February 11, 2011, plaintiffs amended their complaint to include their July 2010 requests. ECF No. 39; Hardy Decl. ¶ 16.

On November 1, 2010, plaintiffs filed a motion for a preliminary injunction (ECF No. 15), which the Court denied on December 17, 2010 (ECF No. 26). As a result of disagreements between the parties over the pace of processing and production, the case was referred to Magistrate Judge Beeler for mediation. Under Judge Beeler's supervision, the parties agreed to a production schedule, which was adjusted after the FBI discovered an additional volume of potentially responsive material. *See* ECF Nos. 56, 84.

Between December 2010 and June 2012, the FBI reviewed over 98,000 pages and released over 50,000 pages to plaintiffs in monthly installments. *See* Hardy Decl. ¶¶ 13-15, 17-34, 60 and Exhibits K-Z, AA-EE. Each letter accompanying each month's release explained that

information was withheld pursuant to exemptions established by 5 U.S.C. § 552(b) and advised plaintiffs of their appeal rights. *See id.* In July and September 2012, the FBI re-released 905 and 246 previously released pages based on consultations with numerous government agencies that allowed for additional information within those pages to be released in part or in full. *See* Hardy Decl. ¶¶ 35-36 and Exhibits FF, GG.

Following the completion of production, the parties negotiated a sampling methodology to limit the scope of the litigation going forward. The FBI agreed to provide plaintiffs sample draft *Vaughn* write-ups for the FBI's application of FOIA exemptions (b)(1), (b)(2), (b)(3), (b)(5), (b)(7)(A), (b)(7)(D), (b)(7)(E), and (b)(7)(F) for a portion of the responsive documents rather than the entire production.[1] Documents were indexed at a rate of 500 pages per month until complete. For the first portion, plaintiffs provided a chart of their selections for *Vaughn* indexing. For the second portion of the sampling, the FBI indexed every withheld-in-full document located at each 500th page. For the third and final portion of the sampling, the FBI selected documents located at 1,000 page intervals. The FBI then prepared draft narrative *Vaughn* write-ups that provided detailed, document-by-document descriptions of the types of documents within the sample and the redactions applied within these sample documents. The FBI provided draft narrative *Vaughn* write-ups for a total of 3,659 pages, thus exceeding the sample of 2.5% of the total 98,554 pages at issue originally suggested by Judge Beeler at the parties' May 2013 case management conference. Hardy Decl. ¶ 60. Upon reviewing the FBI's draft *Vaughn* write-ups, plaintiffs advised the FBI that they would not contest Exemption (b)(1) redactions or withholdings, but reserved the right to challenge other exemptions covered in the draft *Vaughn*s. Hardy Decl. ¶ 61. Accordingly, the FBI has provided, in connection with this motion, a compilation of its narrative *Vaughn* write-ups in final form, which reflect only minor edits from the previous draft versions, as well as a Narrative *Vaughn* Reference Index that serves as a *de facto* table of contents. *See* Hardy Decl. ¶¶ 62-65 and Exhibits II, JJ.

---

[1] Ultimately, within the chosen sample pages, there were no instances where information had been redacted pursuant to Exemptions (b)(3) or (b)(7)(F). Hardy Decl. n.22.

# **LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Because facts in FOIA cases are rarely in dispute, most such cases are decided on motions for summary judgment." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012); *see also Lawyers Comm. for Civil Rights v. Dep't of the Treasury*, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008) ("As a general rule, all FOIA determinations should be resolved on summary judgment."). A court reviews an agency's response to a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B).

# **ARGUMENT**

## I. The FBI Conducted an Adequate Search Reasonably Calculated to Uncover All Responsive Documents.[2]

On summary judgment in a FOIA case, the agency must demonstrate that "it has conducted a search reasonably calculated to uncover all relevant documents." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009) (internal citation omitted). "[A]ffidavits describing agency search procedures are sufficient for purposes of summary judgment . . . if they are relatively detailed in their description of the files searched and the search procedures, and if they are nonconclusory and not impugned by evidence of bad faith . . . [T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Citizens Comm'n on Human Rights v. FDA*, 45 F.3d 1325, 1328 (9th Cir. 1995) (internal citations omitted). The declaration submitted by RIDS chief Hardy more than meets this standard.

As described in the Hardy Declaration, the FBI's search was reasonably calculated to uncover all documents responsive to plaintiffs' requests. In total, over 100,000 pages were

---

[2] As a threshold matter, the FBI submits that it is not a proper defendant to this action. The FOIA grants district courts "jurisdiction to enjoin the agency from withholding agency records," and the statute defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government . . . , or any independent regulatory agency." 5 U.S.C. §§ 552(a)(4)(B), (f)(1). The FBI is a component of DOJ and not an "agency" as defined by the FOIA, and DOJ's FOIA regulations, which govern the FBI, underscore this fact. *See* 28 C.F.R. § 16.1.

located as a result of RIDS's extensive searches and inquiries, which touched nearly every division and unit within the FBI.  RIDS not only searched the most logical locations for responsive records, but upon learning of other locations to search and of specific terms more likely to generate records, followed these leads by conducting necessary additional searches.  Hardy Decl. ¶ 59.

### A.    Plaintiffs' March 2010 Request

The FBI employed several overlapping search mechanisms to identify documents responsive to plaintiffs' March 9, 2010 FOIA request.  As a threshold matter, the extraordinary breadth and depth of plaintiffs' thirty-three part request meant that it did not lend itself readily or naturally to searches that the FBI routinely conducts in response to FOIA requests seeking access to FBI investigative files.  Hardy Decl. ¶ 44.  The standard FBI RIDS search for responsive records pursuant to a FOIA request involves an Automated Case Support System ("ACS") search using terms indexed in the FBI's Central Records System ("CRS").[3]  ACS, an internal computerized subsystem of the CRS, is an investigative tool primarily managed and used by Special Agents to aid them in investigations.  The files are indexed by Special Agents with terms useful to an investigation such as names of individuals, organizations, companies, publications, activities, or foreign intelligence matters (or programs).[4]  As such, the index would not likely contain terms that one would use to conduct more generalized searches for varied terms or concepts such as those relevant to Muslim Community-related material and aggregate data.  *Id.*

---

[3] The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes.  This system consists of a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter.  The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program).  Certain records in the CRS are maintained at FBI headquarters, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices.  Although the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that are potentially responsive to FOIA and Privacy Act requests.  Hardy Decl. ¶ 38.

[4] A fuller description of the ACS and how it is used to retrieve data from the CRS, as well as the discretionary role of the Special Agents in indexing files in the CRS, is set forth in paragraphs 39-43 of the Hardy Declaration.

¶ 45. Nevertheless, as a starting point, RIDS first attempted an index search of the CRS via the Universal Index ("UNI") application of ACS.[5] RIDS broke the broad multi-part request down into many subparts derived from the terms of plaintiffs' March 2010 request, and conducted extensive index searches using over 100 search terms and combinations of search terms from the request.[6] These wide-ranging index searches yielded no records responsive to plaintiffs' request. *Id.*

---

[5] UNI provides a complete subject/case index to all investigative and administrative cases, totaling approximately 115.3 million records. It is used to both index names to cases and search names and cases for use in FBI investigations. Hardy Decl. ¶ 42(c).

[6] These initial searches employed the following terms: "use of informants," "informant procedures," "informant policies," "informant directives," "informant protocols," "informant training materials," "informant guidance," "use of policies," "use of procedures," "use of directives," "use of protocols," "assessment of policies," "assessment of procedures," "assessment of directives," "assessment of guidance," "assessment of protocols," "legal analysis assessment," "carrying out assessments," "training materials," "conducting investigations of groups and organizations," "conducting assessments," "legal reasoning," "training for agents," "training about Muslim culture," "training about Arab communities," "training about Muslim communities," "training regarding Muslim communities," "training about south Asian communities," "training about middle eastern communities," "training materials," "training outlines," "racial profiling," "domain management in Muslim communities," "domain management in middle eastern communities," "domain management in Arab communities," "domain management in Islamic communities," "religious profiling," "FBI Citizenship Academy," "FBI Junior Agent Academy," "investigations of Mosques," "investigations of Islamic Centers," "investigations of Muslim Community Centers," "investigations of members of Mosques," "investigations of Muslim leaders," "investigations of Imams," "assessments of Mosques," "assessments of Islamic centers," "assessment of Muslim community centers," "assessment of members of mosques," "assessment of Muslim leaders," "assessment of Imams," "threat assessment," "Citizenship Academy," "Citizenship Academy Alumni Activities," "Junior Agent Program," "Concentrated Ethnic Communities," "ethnic oriented businesses," "community race," "community ethnicity," "community ethnicity assessments," "community race assessments," "informants northern California," "informant procedures," "informant policies," "informant directives," "informant protocols," "informant training materials," "informant guidance," "policy use," "procedure use," "directives use," "protocol use," "policy assessment," "procedure assessment," "directives assessment," "guidance assessment," "protocol assessment," "legal analysis assessment," "performing assessment," "training materials," "group organization investigations," "conducting group investigations," "organization investigations," "conducting assessments," "legal reasoning," "agent training," "Muslim culture," "Arab communities," "Muslim community training," "South Asian community training," "south Asian communities," "training outlines," "racial profiling," "Muslim community domain management," "Middle Eastern community domain management," "Arab community domain management," "Islamic community domain management," "Citizenship Academy," "Junior Agent Program," "religious profiling," "Northern California Mosques," "Northern California Islamic centers," "Northern California Muslim community centers," "Northern California Muslim leaders," "Northern California Imams," "Mosque Assessments," "Northern California Islamic Centers," "Northern California threat assessment," "Northern California Citizenship Academy," "Northern California Alumni activities," "concentrated ethnic activities," "community ethnicity," and "Northern California ethnicity assessments." Hardy Decl. ¶ 45.

Because the standard ACS search of the CRS indices did not identify any responsive records, RIDS took the extraordinary step of conducting a text search of the CRS by employing the Electronic Case File ("ECF") application of ACS.[7]  Although text searches are by nature burdensome and in RIDS's experience do not generally lead to responsive records because of the breadth of "hits" generated by searching for terms in the massive CRS regardless of context, RIDS nonetheless conducted a text search of the CRS employing all the same terms that were used in the original index search.  However, other than a few records that could be identified as responsive, the text searches also located no records that could be identified as responsive to plaintiffs' multi-part request.   Accordingly, RIDS determined a search of the CRS alone was not a sufficient means of locating responsive material.  Simply put, the CRS records are not categorized in a manner that makes it feasible to locate records using the broad terminology or the types of geographic and ethnic limiters noted in plaintiffs' request.  Further, the CRS is not searchable for aggregate data.   Hardy Decl. ¶ 46.

RIDS therefore proceeded to conduct an individualized inquiry, outside of the CRS system, of all offices at FBI Headquarters ("FBIHQ") that were reasonably likely to have potentially responsive records, in addition to the FBI's SFFO and SCFO, to which plaintiffs had specifically directed their request.  Beginning on April 1, 2010, numerous Electronic Communications ("EC") were circulated to FBIHQ divisions and the two field offices.[8]  The ECs requested that personnel of the designated divisions and offices conduct thorough searches of any documents in their possession responsive to plaintiffs' request and to respond to RMD/RIDS.  Hardy Decl. ¶ 47.  As a result of coordinating with these offices and their operational personnel, RIDS became aware of additional search terms that would be more likely to capture results within the CRS, and conducted another text based search of the CRS using the terms "Community

_____

[7] ECF serves as the central electronic repository for the FBI's official text-based documents.  Hardy Decl. ¶ 42(b).

[8] Within FBIHQ, these search taskings were sent to the Counterterrorism Division, Criminal Investigative Division, Intelligence Directorate, Director's Office, Office of Public Affairs, Office of the General Counsel, and Training Division.  Hardy Decl. n.11.

Outreach," "HUMINT training," "Muslim Culture," and simply "Domain Management" and "Domain," which resulted in the location of additional documents. *Id.* ¶ 48.

RIDS also took the following steps, above and beyond its normal search procedures, to locate responsive records:

- searched the FBI's internal intranet for policies and instructional materials using all the search terms listed above, which resulted in location of additional records[9];
- contacted FBI personnel most likely to have knowledge of any aggregate data collected from investigations that would be responsive to plaintiffs' requests;
- with the assistance of FBI's Training Division ("TD"), compiled a list of all potentially responsive training courses listed within the FBI's Virtual Academy ("FBIVA")[10] from September 2001 through March 10, 2010, which was provided to plaintiffs; after plaintiffs selected the courses they wanted, RIDS obtained electronic courses from TD and contacted the responsible division and/or unit to obtain any selected traditional classroom-based course materials;
- with the assistance of FBI's Counterterrorism Division ("CTD"), obtained copies of the Muslim Cultural Training course materials used by the Combating Terrorism Center ("CTC") for training of FBI Special Agents.

Hardy Decl. ¶¶ 49-52.

As the review of the responsive materials proceeded, RIDS employees contacted operational personnel again for guidance in processing many of the technical materials discovered, and in so doing became aware of leads to additional potentially responsive records located at the FBI's Counterintelligence Training Center ("CITC"). Consequently, an EC was circulated requesting that CITC personnel conduct thorough searches of any documents in their possession potentially responsive to plaintiffs' request and to respond to RMD/RIDS. The CITC

---

[9] During processing, RIDS became aware of certain policy records mentioned within other policy manuals, and located and obtained these records as well. Hardy Decl. ¶ 49.

[10] The FBI coordinates a large portion of its training through the FBIVA. FBIVA also tracks registration and other administrative information for traditional classroom-based instruction. Hardy Decl. ¶ 51.

1    forwarded approximately 30 boxes (approximately 40,000 pages) of records related to HUMINT

2    and behavioral training to RIDS for review. RIDS reviewed these records and determined that

3    approximately half were responsive to the request and within the date range of the request. Hardy

4    Decl. ¶ 53.

5        **B.    Plaintiffs' July 2010 Requests**

6        The FBI conducted its preliminary ACS index search for records using terms from

7    plaintiffs' July 27, 2010 requests, including "racial and ethnic community demographics" and

8    "racial and ethnic behaviors," "racial and ethnic characteristics," "behaviors," and "cultural

9    traditions." Again, these terms are not reflective of the manner in which FBI investigative

10   records are indexed, since the subject matter of plaintiffs' requests is not a named individual or

11   victim, or that of a common investigative subject. As a result, this initial search did not identify

12   any responsive records. Having determined that additional searches outside of ACS were needed

13   to locate records potentially responsive to plaintiffs' requests, the FBI performed an

14   individualized search inquiry outside of the CRS system of those FBI divisions and offices most

15   likely to maintain potentially responsive records by issuing an EC requesting the respective FBI

16   division or office to search for records responsive to plaintiffs' requests that were created on or

17   after December 16, 2007 and on or before August 10, 2010. The FBI prepared and circulated an

18   EC to the Director's Office, Intelligence Directorate ("DI"), and Office of the General Counsel

19   ("OGC") on August 20, 2010, and ECs to SFFO and SCFO on November 16, 2010, and then

20   again on December 6, 2010. The FBI located 597 pages of responsive records in response to

21   these ECs. Hardy Decl. ¶¶ 54-57.

22   **II.    The FBI's Withholdings Were Proper Under FOIA's Exemptions.**

23       The Freedom of Information Act was enacted to "pierce the veil of administrative secrecy

24   and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S.

25   352, 361 (1976) (internal quotation omitted). However, the public's interest in government

26   information under FOIA is not absolute, as "Congress recognized . . . that public disclosure is not

27   always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). FOIA's "basic

28   purpose" reflects a "general philosophy of full agency disclosure unless information is exempted

under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989) (quotation omitted). Thus, FOIA is designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* at 152 (citation omitted).

To that end, FOIA incorporates "nine exemptions . . . which a government agency may invoke to protect certain documents from public disclosure." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996). Ordinarily, government agencies submit "detailed public affidavits identifying the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption" that are "commonly referred to as [] '*Vaughn*' ind[ices]." *Lion Raisins v. Dep't. of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004) (citing *Vaughn v. Rosen*, 484 F.2d 820, 823-25 (D.C. Cir. 1973)). These statutory exemptions must be given "meaningful reach and application." *John Doe Agency*, 493 U.S. at 152. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007). And courts "accord substantial weight to an agency's declarations regarding the application of a FOIA exemption." *Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012). For the reasons discussed below, the FBI's withholdings in this case are appropriate.

**A.      The FBI Properly Withheld Records Pursuant to Exemption (b)(2).**

Following the Supreme Court's decision in *Milner v. Department of Navy*, 131 S. Ct. 1259 (2011), the application of Exemption (b)(2) was narrowed to the withholding of government records which relate to employee relations and human resources issues. In its ruling, the Supreme Court clarified that to be exempt pursuant to (b)(2), information must be related to an agency's personnel rules and practices, relate solely to these rules and practices, and be internal, meaning the agency typically keeps this information to itself for its own use. *Milner*, 131 S. Ct. at 1265 & n.4.

When the FBI first began processing documents for release to plaintiffs, it applied Exemption (b)(2) as it had been historically applied prior to the *Milner* decision. The majority of

information to which the FBI originally applied Exemption (b)(2) no longer qualifies for that exemption after *Milner*. However, in all instances where Exemption (b)(2) no longer applies, it was applied in conjunction with Exemption (b)(7)(E). As Exemption (b)(7)(E) is still applicable in these instances, the narrowing of Exemption (b)(2) did not result in the release of additional information. As reflected in the *Vaughn* index, in those instances in the sample documents where the FBI is defending its application of Exemption (b)(2), the FBI has determined that this redacted information relates solely to the FBI's internal personnel rules and practices and has not been released outside of the FBI. Therefore, this information meets the requirements of *Milner* and remains exempt pursuant to FOIA Exemption (b)(2). *See* Hardy Decl. ¶¶ 67-69 and Exhibit II at 336, 353.

**B.** **The FBI Properly Withheld Records Pursuant to Exemption (b)(5).**

FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, Exemption (b)(5) permits agencies to withhold privileged information, including attorney work product, deliberative materials, and confidential attorney-client communications. *See, e.g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997). The attorney-client privilege "protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012). The attorney work product doctrine protects materials prepared by an attorney or others in anticipation of litigation, including the materials of government attorneys generated in litigation and pre-litigation counseling. *See* Fed. R. Civ. P. 26(b)(3); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 154; *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004). As the Supreme Court has observed, "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). The deliberative process privilege is designed to "prevent injury to the quality of agency decisions" by protecting the "decision

1  making processes of government agencies," *NLRB*, 421 U.S. at 150, 151, and protects "materials

2  that are both predecisional and deliberative." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537

3  (D.C. Cir. 1993).

4      Within the sample documents, the FBI has asserted Exemption (b)(5) to protect

5  confidential communications between clients seeking legal advice from professional legal

6  advisers in their capacities as lawyers, pursuant to the attorney-client privilege ("ACP") and

7  documents and information prepared by or for attorneys in reasonable anticipation of litigation,

8  pursuant to the attorney work-product privilege ("AWP"). It has also asserted the exemption to

9  protect the internal deliberations of government employees—i.e., recommendations, analyses,

10  opinions, and other non-factual information comprising the decision-making process—pursuant

11  to the deliberative process privilege ("DPP"). In all instances where Exemption (b)(5) has been

12  asserted, the FBI has ascertained that all redacted information is inter- or intra-agency and

13  privileged, and that it should remain confidential. Hardy Decl. ¶ 71; Exhibit II at 299-300 (ACP),

14  329-330 (ACP), 375-76 (ACP), 386-87 (ACP), 390-91 (DPP), 475 (ACP, AWP), 517-18 (DPP),

15  565 (ACP, AWP). Accordingly, this information was properly withheld pursuant to Exemption

16  (b)(5).

17      **C.    The FBI Properly Withheld Records Pursuant to Exemption (b)(7).**

18      FOIA protects from mandatory disclosure "records or information compiled for law

19  enforcement purposes" when, *inter alia*, production of the documents "(A) could reasonably be

20  expected to interfere with enforcement proceedings" (Exemption 7(A)), "(D) could reasonably

21  be expected to disclose the identity of a confidential source" or "information furnished by a

22  confidential source" (Exemption 7(D))," or "(E) would disclose techniques and procedures for

23  law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement

24  investigations or prosecutions if such disclosure could reasonably be expected to risk

25  circumvention of the law" (Exemption 7(E)). 5 U.S.C. § 552(b)(7).

26      As a threshold issue when analyzing Exemption (b)(7), the Court must determine whether

27  the documents have a law enforcement purpose, which requires an examination of whether the

28  agency serves a "law enforcement function." *Church of Scientology Int'l v. IRS*, 995 F.2d 916,

919 (9th Cir. 1993) (internal citation and quotation marks omitted).  The FBI has such a law enforcement function, as it "has a clear law enforcement mandate."  *Rosenfeld v Dep't of Justice*, 57 F.3d 803, 808 (9th Cir. 1995); *see also* Hardy Decl. ¶ 72 (describing FBI's law enforcement function).  In order to satisfy Exemption (b)(7)'s threshold requirement, a government agency with a clear law enforcement mandate—such as the FBI—"'need only establish a rational nexus between enforcement of a federal law and the document for which [a law enforcement] exemption is claimed.'"  *Rosenfeld*, 57 F.3d at 808 (citation omitted).

The FBI easily satisfies the rational nexus requirement, as all of the responsive records addressed herein were created or compiled (1) in the course of FBI criminal investigations and intelligence gathering efforts, to further the FBI's investigative efforts or intelligence mission of predicting and/or preventing threats to national security; (2) for the purpose of assisting the FBI's state and local law enforcement partners; and/or (3) for the purpose of developing or implementing law enforcement and intelligence gathering methods, techniques, procedures, and guidelines.  Hardy Decl. ¶ 72.

### 1.    Exemption (b)(7)(A)

Exemption (b)(7)(A) permits the withholding of:  (1) "records or information"; (2) "compiled for law enforcement purposes"; (3) the disclosure of which "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7).  Congress enacted Exemption (b)(7)(A) because it "'recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it came time to present their cases'" in court.  *John Doe Agency*, 493 U.S. at 156 (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)).  "Interference" need not be established on a document-by-document basis; instead, courts may determine the exemption's applicability "generic[ally]," based on the categorical types of records involved.  *Robbins Tire & Rubber Co.*, 437 U.S. at 236.  To satisfy its burden justifying the applicability of Exemption (b)(7)(A), the FBI need only demonstrate that (1) a law enforcement proceeding is pending or prospective, and (2) release of the information could reasonably be expected to cause some articulable harm to the proceeding.  *Id.* at 224.

Here, in evaluating FBI information for withholding pursuant to Exemption (b)(7)(A), RIDS endeavored to ensure that the information withheld met these parameters. RIDS confirmed with FBI personnel engaged in pending law enforcement and intelligence gathering matters that the information redacted pursuant to Exemption (b)(7)(A) was associated with pending law enforcement proceedings and release would jeopardize the pending investigations. Thus, by protecting only the information meeting these qualifications, the FBI was able to release the most amount of information to plaintiffs, without jeopardizing the outcome of pending FBI law enforcement procedures. Hardy Decl. ¶ 74; Exhibit II at 141-42, 159, 173-74, 178, 191-92, 194-95, 205-06, 237-38, 321-22, 391, 399-403, 407-08, 417, 420-21, 426-28, 432, 439-440, 489-90, 535-36. For these reasons, the information that was withheld should remain protected under Exemption (b)(7)(A).

## 2. Exemption (b)(7)(D)

The FBI has withheld material under Exemption (b)(7)(D), which permits the withholding or redacting of law enforcement records, the release of which "could reasonably be expected to disclose the identity of a confidential source . . . and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation . . . information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). A confidential source is one who "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993) (internal citation and quotation marks omitted). An implied assurance of confidentiality could be found "when circumstances such as the nature of the crime investigated and the witness' relation to it support an inference of confidentiality." *Landano*, 508 U.S. at 179, 181. In such circumstances, the government is entitled to a presumption of inferred confidentiality. *Id.* Exemption (b)(7)(D) requires no balancing of public and private interests. *See Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 575-76 (D.C. Cir. 1990).

Specifically, the FBI has asserted Exemption (b)(7)(D) to protect the names, identifying information, and information provided by third parties under both express and implied assurances of confidentiality. *See* Hardy Decl. ¶¶ 75-78; Exhibit II at 219-20, 246-48, 302-04, 350-51, 391-

93, 401-02, 408-09, 416, 426, 432-33, 439, 464, 482-84, 536-37.  With respect to implied

confidential source information, the information was provided to the FBI by individuals or local

law enforcement under circumstances demonstrating that they expected their association with the

FBI and the information they provided would remain confidential.  In these instances, it was clear

to the FBI that release of this information could subject the providers to violence, physical or

economic harm, or public embarrassment.  Hardy Decl. ¶ 78.[11]  Regardless of whether the

assurances of confidentiality were express or implied, the information provided was detailed and

singular in nature, and revealing the identity of—and information provided by—these sources

would have a chilling effect on the activities and cooperation of these and other future FBI

confidential sources.  *Id.* ¶ 76.  Accordingly, application of Exemption (b)(7)(D) was justified.

*See Span v. Dep't of Justice*, 696 F. Supp. 2d 113 (D.D.C. 2010) (applying Exemption 7(D) to

confidential source-related information).

### 3.    Exemption (b)(7)(E)

Exemption (b)(7)(E) protects from disclosure information compiled for law enforcement

purposes where release of the information "would disclose techniques and procedures for law

enforcement investigations or prosecutions," or where it would "disclose guidelines for law

enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk

circumvention of the law."  5 U.S.C. § 552(b)(7)(E).[12]  Congress intended that Exemption

---

[11] In the case of local law enforcement agencies and personnel, releasing information they provided could mean loss of public trust and could also impede their ability to perform their law enforcement duties.  *Id.*

[12] Courts are divided as to whether the phrase "if such disclosure could reasonably be expected to risk circumvention of the law" applies only to "guidelines" or also applies to "techniques and procedures."  *See, e.g., Asian Law Caucus v. Dep't of Homeland Security*, No. C 08-00842 CW, 2008 WL 5047839 at *3 (N.D. Cal. Nov. 24, 2008) (noting Ninth Circuit has not "squarely addressed" issue).  However, the better reasoned decisions recognize that providing categorical protection to "techniques and procedures" is consistent with both the plain meaning of the statute and the history of the amendments to exemption (7)(E) in 1986.  *See, e.g., Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Security*, 626 F.3d 678, 681 (2d Cir. 2010); *see also Durrani v. Dep't of Justice*, 607 F. Supp. 2d 77, 91 (D.D.C. 2009) (techniques and procedures entitled to categorical protection under (7)(E)).  In any event, even assuming that a showing that "disclosure could reasonably be expected to risk circumvention of the law" were required to protect law enforcement "techniques and procedures" from disclosure, the FBI would still be entitled to summary judgment because it has demonstrated that disclosure of the techniques and procedures referenced in the withheld material would pose a genuine threat of circumvention.  *See* Hardy Decl. ¶¶ 79-80.

(b)(7)(E) protect from disclosure techniques and procedures used to prevent and protect against crimes, as well as techniques and procedures used to investigate crimes after they have been committed. *See, e.g., PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 250-51 (D.C. Cir. 1993) (holding that portions of FBI manual describing patterns of violations, investigative techniques, and sources of information available to investigators were protected by Exemption 7(E)).

Within the sample documents and a majority of the documents responsive to plaintiffs' requests overall, Exemption (b)(7)(E) has been applied to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement and intelligence gathering missions, and also to non-public details about techniques and procedures that are otherwise  known to the public.  As a law enforcement and intelligence gathering agency, the FBI relies on numerous non-public techniques and methods to prevent and detect crime and threats to the national security of the United States.  The effectiveness of these techniques and methods often hinges on the FBI's tactical advantage of being unpredictable and/or operating undetected by criminals.  Release of this type of information would expose these strategies, techniques and methods, and deprive the FBI of any such tactical advantage against criminals and terrorists.  Thus, release of this information presents a serious threat of law enforcement circumvention.   Hardy Decl. ¶ 80; Exhibit JJ at 4-15 (identifying all *Vaughn* narrative write-ups for Exemption 7(E), organized by document categories and sub-categories) and Exhibit II (corresponding pages identified in Ex. JJ).

When determining whether Exemption (b)(7)(E) applied to information within the responsive documents, the FBI made great efforts to determine whether information proposed for redaction had been publicly released.  This often entailed searching through public source material and seeking out FBI personnel with institutional knowledge of the information in question.  Throughout the production of records to plaintiffs, the FBI only protected information pursuant to Exemption (b)(7)(E) when it determined such information was not known by the general public.  Hardy Decl. ¶ 81.  Once information proposed for redaction under Exemption 7(E) was determined to be non-public, the FBI further analyzed the material to determine whether there was an actual threat of law enforcement circumvention if the information were released.  In trying to determine such threats, employees reviewing documents for release continually sought

the expertise of operational personnel, throughout the FBI. These operational personnel on the front lines of preventing and investigating crimes and threats to national security provided critical determinations of whether information was sensitive and needed to be withheld to safeguard techniques and procedures. This process allowed RIDS to release the maximum amount of information to plaintiffs, without undermining the FBI's law enforcement, national security, and intelligence gathering missions. *Id.* ¶ 82. For these reasons, the information that was withheld should remain protected under Exemption (b)(7)(E).

**III.    The FBI Has Produced All Reasonably Segregable Portions of Responsive Records.**

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). This provision does not require disclosure of records in which the non-exempt information that remains is meaningless. *See Asian Law Caucus*, 2008 WL 5047839 at *6 (defendant carried burden of segregating non-exempt information where redactions often consisted of single sentences, clauses, or words and pages withheld in full contained small portions of non-exempt material that was inextricably intertwined with exempt information); *see also* Hardy Decl. ¶ 83. Plaintiffs have been provided all non-exempt records or portions thereof that are responsive to the March 2010 and July 2010 requests. Hardy Decl. ¶¶ 83-84. The FBI reviewed each responsive page to identify non-exempt information that could be reasonably segregated from exempt information and released all segregable information to plaintiffs. *Id.* Accordingly, the FBI has satisfied its obligation to produce all reasonably segregable portions of the responsive records.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant defendant's motion for summary judgment.

Date: Sept. 9, 2014                    By:  _/s/Lynn Y. Lee_
                                            Lynn Y. Lee

                                       STUART F. DELERY
                                       Assistant Attorney General
                                       JOHN R. TYLER
                                       Assistant Branch Director
                                       LYNN Y. LEE
                                       Trial Attorney
                                       U.S. Department of Justice, Civil Division
                                       Federal Programs Branch
                                       P.O. Box 883
                                       Washington, DC 20530
                                       (202) 305-0531
                                       (202) 616-8470 (fax)
                                       lynn.lee@usdoj.gov

                                       _Attorneys for Defendants_