IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, ASIAN LAW CAUCUS, SAN FRANCISCO BAY GUARDIAN | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 10-cv-3759-RS |
| FEDERAL BUREAU OF INVESTIGATION | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), of the Federal Bureau of Investigation ("FBI"), in Winchester, Virginia.  I have held this position since August 1, 2002.  Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 219 employees who staff a total of ten (10) FBI Headquarters ("FBIHQ") units and two (2) field

operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order ("E.O.") 13,526, and the preparation of declarations in support of Exemption (b)(1) claims under the FOIA. I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. 13,526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am familiar with the FBI's handling of plaintiffs' multi-part FOIA request seeking access to certain FBI training, policies, investigations, and aggregate data pertaining to race, ethnicity, culture, confidential human informants ("CHSs"), the FBI's domain management program, the FBI's community outreach program, and the FBI's Junior Agent Program.

(4)     The purpose of this declaration is to explain the FBI's search for responsive records and its justifications for the withholding of information from the records released to plaintiffs pursuant to applicable FOIA exemptions.

## CORRESPONDENCE RELATED TO PLAINTIFFS' FOIA REQUESTS

(5)     On March 12, 2010, the FBI received a FOIA request dated March 9, 2010, from the Asian Law Caucus ("ALC"), the American Civil Liberties Union of Northern California ("ACLU-NC"), and the *San Francisco Bay Guardian* ("*Guardian*"), for information regarding the alleged investigation and surveillance of Muslim communities.  The request was further subdivided into thirty-three subparts of related information and aggregate data.  In addition, the plaintiffs requested expedited processing and a waiver of all fees.  (**See Exhibit A.**)

(6)     Plaintiffs asserted that they were entitled to expedited status because their request pertained to a matter "of widespread and exceptional media interest" and because the topic of the request was a matter about "which there exist[ed] possible questions about the government's integrity which effect public confidence."  Expedited status was granted by DOJ's Office of Public Affairs on March 15, 2010.[1]  (**See Exhibit B.**)

(7)     On March 19, 2010, the FBI forwarded to the plaintiffs a series of letters.  The FBI first acknowledged the request, which had been assigned **FOIA Request No. 1144839-000**. The FBI advised that a search was being conducted for records responsive to plaintiffs' request. (**See Exhibit C.**)  The second and third letters were sent out on this date to advise the plaintiffs that both their fee waiver and expedited status requests had been granted.  (**See Exhibits D and E.**)

(8)     On June 15, 2010, and again on September 20, 2010, the FBI sent status letters to the plaintiffs advising that it was still searching for, retrieving, and evaluating files that may be potentially responsive to the request.  (**See Exhibits F and G.**)

---

[1] Pursuant to DOJ FOIA regulation 28 C.F.R. § 16.5(d)(2), requests for expedited processing premised on a claim that the requested records would reflect upon "possible questions about the government's integrity which [could] affect public confidence" are adjudicated by DOJ's Office of Public Affairs rather than the component to which the FOIA request was directed.

(9)    By letter dated July 27, 2010, plaintiffs submitted additional FOIA requests to the FBI's San Francisco Field Office ("SFFO") and Sacramento Field Office ("SCFO") requesting information concerning the "FBI's implementation of its authority to collect information about and 'map' racial and ethnic demographics, 'behaviors,' and 'life style characteristics' in local communities in order to assist the FBI's 'domain awareness' and 'intelligence analysis' activities" within Northern California.  Plaintiffs also requested a fee waiver.  (**See** Exhibit H.)

(10)    By letters dated August 6, 2010, the FBI acknowledged receipt of plaintiffs' July 27, 2010 FOIA requests and assigned them **FOIA Request Nos. 1151949-000 and 1151951-000**.  (**See** Exhibit I.)

(11)    Plaintiffs filed the instant lawsuit involving FOIA Request No. 1144839-000 on August 24, 2010.  *See ACLU et al. v. FBI*, 10-cv-3759-RS (N.D. Cal.), ECF No. 1, Complaint.

(12)    By letters dated November 4, 2010, the FBI provided plaintiffs with status updates for FOIA Request Nos. 1151949-000 and 1151951-000.  The FBI informed plaintiffs that it was searching for potentially responsive documents and analyzing any documents located to determine responsiveness.  (**See** Exhibit J.)

(13)    By letter dated December 9, 2010, the FBI released 118 pages of a total of 360 reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(2), (b)(6), (b)(7)(C), and (b)(7)(E).  Additionally, plaintiffs were advised that they could appeal the FBI's response to Department of Justice, Office of Information Policy ("OIP") within sixty days from the date of its letter.  (**See** Exhibit K.)

4

(14)    By letter dated December 28, 2010, the FBI released 777 pages of a total of 834

reviewed in response to plaintiffs' FOIA request 1144839-000.[2]  Plaintiffs were informed that

information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(2), (b)(4), (b)(6),

(b)(7)(C), and (b)(7)(E).  Additionally, plaintiffs were advised of their appeal rights.  **(See**

**Exhibit L.)**

(15)    By letter dated January 31, 2011, the FBI released 566 pages in full in response to

plaintiffs' FOIA request 1144839-000.  Plaintiffs were advised of their appeal rights.  **(See**

**Exhibit M.)**

(16)    On February 11, 2011, plaintiffs amended their complaint to include FOIA

Request Nos. 1151949-000 and 1151951-000.  *See ACLU et al. v. FBI*, 10-cv-3759-RS (N.D.

Cal.), ECF No. 39, Amended Complaint.

(17)    By letter dated February 28, 2011, the FBI released 586 pages of a total of 1,034

reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that

information was withheld pursuant to FOIA Exemption 5 U.S.C. §§ 552(b)(4).  Additionally,

plaintiffs were advised of their appeal rights.  **(See Exhibit N.)**

(18)    By letter dated March 31, 2011, the FBI released 957 of a total of 1,036 pages

reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that

---

[2] Included in the December 28, 2010 release were 298 pages previously processed in response to other ACLU FOIA requests concerning the "FBI's implementation of its authority to collect information about and map racial and ethnic demographics, behaviors, and life style characteristics in local communities in order to assist the FBI's domain awareness and intelligence analysis activities" as discussed in the FBI's December 16, 2008 Domestic Intelligence and Operations Guide (DIOG). These requests (dated July 27, 2010) were sent to 48 different FBI field offices and resident agencies, and overlap the request in 1144839-000 in the policy/training area. Most of those requests never proceeded beyond the administrative level. However, requests submitted by the ACLU of Michigan and the ACLU of New Jersey were ultimately the subject of litigation. *See ACLU of Michigan v. FBI & DOJ*, 2012 WL 4513626 (E.D. Mich. Sept. 30, 2012), *aff'd* 734 F.3d 460 (6th Cir. 2013), and *ACLU of New Jersey v. DOJ*, 2012 WL 4660515 (D.N.J. Oct. 2, 2012), *aff'd* 733 F.3d 526 (3d Cir. 2013).

information was withheld pursuant to FOIA Exemption 5 U.S.C. §§ 552(b)(4). Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit O.)**

(19)    By letter dated May 13, 2011, the FBI responded to Part (3) of FOIA Request No. 1144839. Specifically, the FBI explained that based on the information plaintiffs provided under this subheading, the FBI conducted a search of the FBI's Central Record System ("CRS") and made inquiries to the operational divisions and FBI Field Offices most likely to maintain responsive records. The FBI was unable to locate any records responsive to Part (3) of plaintiffs' request, through this search. Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit P.)**

(20)    By letter dated May 27, 2011, the FBI released 3,518 pages of a total of 4,082 reviewed in response to plaintiffs' FOIA request 1144839-000. Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F). Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit Q.)**

(21)    By letter dated June 17, 2011, the FBI released 392 pages of a total of 437 reviewed in response to plaintiffs' FOIA request 1144839-000. Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F). Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit R.)**

(22)    By letter dated June 27, 2011, the FBI released 569 pages of a total of 2,891 reviewed in response to the three FOIA requests at issue in plaintiffs' amended complaint. Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C.

§§ 552(b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).[3]  Pursuant to an agreement between the parties, the FBI also provided plaintiffs with a chart outlining the number of pages responsive to plaintiffs' requests in the FOIA Document Processing System (FDPS), the number of Legal Administrative Specialists assigned to processing, and the current status of each file within that system (*i.e.*, released, under classification review, or in disclosure processing). Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit S.)**

(23)    By letter dated July 27, 2011, the FBI released 946 pages of a total of 2711 reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Plaintiffs were also provided with the current status of each file in FDPS, per agreement.  Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit T.)**

(24)    By letter dated August 26, 2011, the FBI released 2,633 of a total of 4,699 reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Plaintiffs were also provided with the current status of each file in FDPS, per agreement.  Additionally, plaintiffs were advised of their appeal rights. **(See Exhibit U.)**

(25)    By letter dated September 27, 2011, the FBI released 3,427 of a total of 4,074 reviewed[4] in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that

---

[3] Included in this release were 127 pages (596 reviewed) also responsive to FOIA Request Nos. 1151951 and 1151949. These 596 pages processed for the July 27, 2010 request overlap with Parts 2(a) and 2(C) of FOIA Request No. 1144839.

[4] In its September 27, 2011 release letter, the FBI stated it had released 3428 of a total of 4075 reviewed pages. Following this release, it was found that one of the pages released was inadvertently included in the FBI's release. Plaintiff returned the release to the FBI and the FBI sent an amended letter with amended release to plaintiff on October 13, 2011. The FBI has only attached the amended letter to this declaration.

information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Plaintiffs were also provided with the current status of each file in FDPS, per agreement. Additionally, plaintiffs were advised of their appeal rights. (**See Exhibit V.**)

(26) By letter dated October 27, 2011, the FBI released 2,054 of a total of 2,648 reviewed pages in response to plaintiffs' FOIA request 1144839-000. Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Plaintiffs were also provided with the current status of each file in FDPS, per agreement. Additionally, plaintiffs were advised of their appeal rights. (**See Exhibit W.**)

(27) By letter dated November 28, 2011, the FBI released 1,609 of a total of 2,656 reviewed in response to plaintiffs' FOIA request 1144839-000. Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Plaintiffs were also provided with the current status of each file in FDPS, per agreement. Additionally, plaintiffs were advised of their appeal rights. (**See Exhibit X.**)

(28) By letter dated December 13, 2011, the FBI released 2,117 pages of a total of 3,380 reviewed in response to plaintiffs' FOIA request 1144839-000. Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(4), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Plaintiffs were also provided with the current status of each file in FDPS, per agreement. Additionally, plaintiffs were advised of their appeal rights. (**See Exhibit Y.**)

(29)    By letter dated January 31, 2012, the FBI released 5,968 pages of a total of 12,426 reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Additionally, plaintiffs were advised of their appeal rights.  (**See Exhibit Z.**)

(30)    By letter dated February 29, 2012, the FBI released 2,649 pages of a total of 8,182 pages reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Additionally, plaintiffs were advised of their appeal rights.  (**See Exhibit AA.**)

(31)    By letter dated March 30, 2012, the FBI released 9,904 pages of a total of 16,387 pages reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Additionally, plaintiffs were advised of their appeal rights.  (**See Exhibit BB.**)

(32)    By letter dated April 30, 2012, the FBI released 4,866 pages of a total of 8,552 pages reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).  Additionally, plaintiffs were advised of their appeal rights.  (**See Exhibit CC.**)

(33)    By letter dated May 31, 2012, the FBI released 3,412 pages of a total of 13,165 pages reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3),

(b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).  Additionally, plaintiffs were advised of their appeal rights.  **(See Exhibit DD.)**

(34)     By letter dated June 29, 2012, the FBI released 4,137 pages of a total of 8,886 pages reviewed in response to plaintiffs' FOIA request 1144839-000.  Plaintiffs were informed that information was withheld pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(4), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).  Additionally, plaintiffs were advised of their appeal rights.  **(See Exhibit EE.)** [5]

(35)     By letter dated July 31, 2012, the FBI provided plaintiffs the results of its consultations with numerous government agencies concerning information located within the responsive records.  In this letter, the FBI explained that of the 3,109 pages sent to outside government agencies for review, certain pages were being re-released based on the results the FBI's consultations with the other agencies now allowing for additional information on 905 pages to be released in part or in full.[6]  Plaintiffs were informed that the FBI and other government agencies continue to withhold certain information pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(4), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).  Plaintiffs were also advised that some of the FBI's consultations with other government agencies were ongoing.  Additionally, plaintiffs were advised of their appeal rights.  **(See Exhibit FF.)**

---

[5] In the time since the letters described herein as Exhibits Y, EE, FF, and GG were created, the FBI has changed its document processing program from Corel WordPerfect to Microsoft Word.  The only two copies of these letters available to the FBI were saved in Corel WordPerfect format.  In compiling exhibits for this declaration, it was necessary for the FBI to open and print these letters utilizing Microsoft Word.  Please note that this has produced some formatting discrepancies between Exhibits EE and FF and the letters originally sent to plaintiffs.

[6]  When pages were sent to OGAs for review, the portions requiring their input were blocked out with a notation stating "REFERRAL/CONSULT."  To the extent that any other information on the page could be released by the FBI pending input from the OGAs, that information was released, so that a page released to plaintiff may have included non-exempt information, information redacted by the FBI pursuant to FOIA exemptions, and information blocked out pending OGA review.  Once the OGAs provided their input, the page would be re-processed, any additional information that could be released based on OGA review would be released, and any information that the OGAs advised was exempt would be redacted and withheld pursuant to FOIA exemptions.

(36)    By letter dated September 5, 2012, the FBI provided plaintiffs with the final

results of its consultations with other government agencies.  The FBI explained that out of 319

additional pages sent to outside government agencies for review, 246 pages were being re-

released in part or in full.  Plaintiffs were informed that the FBI and other government agencies

had redacted information on these pages pursuant to FOIA Exemptions 5 U.S.C. §§ 552(b)(1),

(b)(3), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Additionally, plaintiffs were advised of their

appeal rights.  **(See Exhibit GG.)**

(37)    By letter dated November 21, 2012, the FBI re-released to plaintiffs a document it

had originally processed for its first release of responsive material.  Due to the change in FBI

FOIA processing policy over the course of the two years it took to process all of the responsive

documents, the FBI re-processed this document based on updated processing guidelines.[7]  The

FBI explained that out of 157 pages reviewed, it was releasing 156 in full or in part.[8]  The FBI

informed plaintiffs that the FBI had redacted information pursuant to FOIA Exemptions 5 U.S.C.

§§ 552(b)(1), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).  Additionally, plaintiffs were advised of

their appeal rights.  **(See Exhibit HH.)**

### EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(38)    The Central Records System ("CRS") enables the FBI to maintain information

which it has acquired in the course of fulfilling its mandated law enforcement responsibilities.

---

[7] Among other things, in the years that the FBI was processing the multitudes of records responsive to plaintiffs' requests, the Supreme Court decision in Milner altered the landscape in terms of applying Exemption 2; various Attorney General memoranda and other processing guidance were issued by DOJ, and numerous other internal policy changes occurred within the FBI.  All of these changes compiled resulted in updates to the guidelines being followed by the FBI processing records in this case.

[8] At Exhibit K, the FBI originally reviewed 360 pages and released 118 pages in full or part to plaintiffs. This release encompassed two versions of the same PowerPoint presentation provided at Exhibit HH, one version slightly smaller than the other.  When the discretionary decision was made to re-release the PowerPoint presentation at Exhibit K, the FBI processed the larger, more complete version of the nearly identical presentations.  In addition, each slide was compared with each version so that the slide with the most information was processed.  This was a good faith effort by the FBI to provide plaintiffs with the most information possible.  Any information not provided was merely duplicative to other slides now released.

The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records in the CRS are maintained at FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices. Although the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that are potentially responsive to FOI/Privacy Act requests. The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(39) On or about October 16, 1995, the ACS system was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that were previously automated. ACS can be described as an internal computerized subsystem of the CRS. Because the CRS cannot electronically query the case files for data, such as an individual's name or social security number, the required information is duplicated and moved to the ACS so that it can be searched. More than 105 million records from the CRS were converted from automated systems previously utilized by the FBI. Automation did not change the CRS; instead, automation has facilitated more economic and expeditious access to records maintained in the CRS.

(40) The retrieval of data from the CRS is made possible through the ACS using the General Indices, which are arranged in alphabetical order. Entries in the General Indices fall into two categories:

> (a) A "main" entry — A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.

12

(b) A "reference" entry — "Reference" entries, sometimes called "cross-references" are generally only a mere mention or reference to an individual, organization, or other subject matter contained in a document located in another "main" file on a different subject matter.

(41)     Searches made in the General Indices to locate records concerning particular subjects, such as those requested by plaintiffs, are made by searching the subjects in the index.

(42)     The ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a) Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"). When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation, which in this case is FBI Headquarters; and "12345" indicates the individual case file number for the particular investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 115.3 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(43)     The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") - and on occasion, support employees - assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, i.e., the numerous subjects requested by plaintiffs. Paragraphs 45 and 48 *infra.* list search terms utilized in ACS).

## SEARCH FOR RECORDS RESPONSIVE TO
## PLAINTIFFS' MARCH 9, 2010 FOIA REQUEST

(44)     The FBI has employed several, overlapping search mechanisms to identify documents responsive to plaintiffs' requests. As a threshold matter, due to the extraordinary breadth and depth of plaintiffs' thirty-three part March 9, 2010 FOIA request, the request does not lend itself readily or naturally to searches that the FBI routinely conducts in response to FOIA requests seeking access to FBI investigative files.

(45)     The standard FBI RIDS search for responsive records pursuant to a FOIA request involves an ACS search using terms indexed in the CRS. ACS is an investigative tool primarily

managed and used by Special Agents to aid them in investigations.[9]   The files are indexed by

Special Agents with terms useful to an investigation such as names of individuals, organizations,

companies, publications, activities, or foreign intelligence matters (or programs).  As such, the

index would not likely contain terms that one would use to conduct more generalized searches

for varied terms or concepts such as those relevant to Muslim Community- related material and

aggregate data.  Nevertheless, as a starting point, RIDS first attempted an index search of the

CRS via the UNI application of ACS.  To accomplish this significant task, RIDS took the broad

multi-part request and broke it down into many subparts derived from the terms of the request

itself.  As a result, RIDs conducted extensive index searches with the following terms and/or

combinations of terms from the plaintiffs' request: "use of informants", "informant procedures",

"informant policies", "informant directives", "informant protocols", "informant training

materials", "informant guidance", "use of policies", "use of procedures", "use of directives",

"use of protocols", "assessment of policies", "assessment of procedures", "assessment of

directives", "assessment of guidance", "assessment of protocols", "legal analysis assessment",

"carrying out assessments", "training materials", "conducting investigations of groups and

organizations", "conducting assessments", "legal reasoning", "training for agents", "training

about Muslim culture", "training about Arab communities", "training about Muslim

communities", "training regarding Muslim communities", "training about south Asian

communities", "training about middle eastern communities", "training materials", "training

outlines", "racial profiling", "domain management in Muslim communities", "domain

management in middle eastern communities", "domain management in Arab communities",

"domain management in Islamic communities", "religious profiling", "FBI Citizenship

---

[9] RIDS also searched for any previously processed responsive information contained within its FOIA Document Processing System ("FDPS").  Among the responsive items located were the DIOG and portions of DIOG training materials.

Academy", "FBI Junior Agent Academy", "investigations of Mosques", "investigations of Islamic Centers", "investigations of Muslim Community Centers", "investigations of members of Mosques", "investigations of Muslim leaders", "investigations of Imams", "assessments of Mosques", "assessments of Islamic centers", "assessment of Muslim community centers", "assessment of members of mosques", "assessment of Muslim leaders", "assessment of Imams", "threat assessment", "Citizenship Academy", "Citizenship Academy Alumni Activities", "Junior Agent Program", "Concentrated Ethnic Communities", "ethnic oriented businesses", "community race", "community ethnicity", "community ethnicity assessments", "community race assessments", "informants northern California", "informant procedures", "informant policies", "informant directives", "informant protocols", "informant training materials", "informant guidance", "policy use", "procedure use", "directives use", "protocol use", "policy assessment", "procedure assessment", "directives assessment", "guidance assessment", "protocol assessment", "legal analysis assessment", "performing assessment", "training materials", "group organization investigations", "conducting group investigations", "organization investigations", "conducting assessments", "legal reasoning", "agent training", "Muslim culture", "Arab communities", "Muslim community training", "South Asian community training", "south Asian communities", "training outlines", "racial profiling", "Muslim community domain management", "Middle Eastern community domain management", "Arab community domain management", "Islamic community domain management", "Citizenship Academy", "Junior Agent Program", "religious profiling", "Northern California Mosques", "Northern California Islamic centers", "Northern California Muslim community centers", "Northern California Muslim leaders", "Northern California Imams", "Mosque Assessments", "Northern California Islamic Centers", "Northern California threat assessment", "Northern California Citizenship

Academy", "Northern California Alumni activities", "concentrated ethnic activities", "community ethnicity", and "Northern California ethnicity assessments." These wide-ranging index searches yielded no records responsive to plaintiffs' request.

(46)     Given that a standard index search of the CRS via ACS did not locate responsive records, RIDS took the extraordinary step of conducting a text search of the CRS by employing the ECF application of ACS. Text searches are by nature burdensome and in RIDS's experience do not generally lead to responsive records because of the breadth of "hits" generated by searching for terms in the massive CRS given that a text search will locate the term regardless of context. Nonetheless, RIDS conducted a text search of the CRS employing all the same terms that were used in the index search as identified above. Other than a few records that could be identified as responsive, the text searches also located no records that could be identified as responsive to plaintiffs' multi-part request.[10] Accordingly, RIDS determined a search of the CRS alone was not a sufficient means of locating responsive material given the nature of this request. Simply put, the CRS records are not categorized in a manner that makes it feasible to locate records using the broad terminology of the request or the types of geographic and ethnic limiters noted in the request. Further, the CRS is not searchable for aggregate data.

(47)     Next, RIDS conducted an individualized inquiry (outside of the CRS system) of all offices at FBIHQ that were reasonably likely to have potentially responsive records, in

_____

[10] For example, under the term "Informant Policies" a file described simply as "training documentation" was located. This is an extremely voluminous general file pertaining to a variety of administrative training documents most of which would not be responsive to the request. Another example, under the term "Policy Use," multiple security related files were located but were not identifiable to the specific subjects of the request. Under "Guidance Assessment," a large control file was located that contained field office "intelligence directive" related information, not specific to the subjects of the request. "Conducting Assessments" resulted in a file described as "Counterintelligence Division protocol for regional assessments" and a file described simply as "Statistical" and another described as "CJIS Objectives and goal documentation." None of these could be identified as responsive to the specific subjects of the request. A multitude of control files came up under "Muslim Culture" such as files ranging from "Document Police Schools" to "ITU Training" and "Interview." In an attempt to interpret the plaintiffs' request broadly, the FBI did process the few specific references that could be identified to these request terms. However, these results did not generate the type of specific material that was sought through the request.

addition to the FBI's SFFO and SCFO (to which plaintiffs had specifically directed requests).

Beginning on April 1, 2010, numerous Electronic Communications ("EC") (internal memoranda)

were circulated to FBIHQ divisions and the two field offices.[11]  The ECs requested that

personnel of the designated divisions and offices conduct thorough searches of any documents in

their possession responsive to plaintiffs' request and to respond to RMD/RIDS.[12]

(48)    As a result of coordination efforts with these offices and their operational

personnel, RIDS became aware of additional search terms that would be more likely to capture

results within the CRS.  RIDS conducted a secondary text based search of the CRS to follow up

on the leads provided by operational personnel to ensure that all potentially responsive

information had in fact been located.  RIDS utilized the following additional terms:

"Community Outreach", "HUMINT training", "Muslim Culture", and simply "Domain

Management" and "Domain."[13]  Additional records were located through these searches.

(49)    RIDS also took the extraordinary step of conducting a search of its internal

intranet for policies and instructional materials using the search terms in paragraphs 45 and 48

*supra*.  As a result, additional records were located.[14]  Further, during processing, RIDS became

---

[11]   Within FBIHQ, ECs were sent to the Counterterrorism Division ("CTD"), Criminal Investigative Division ("CID"), Intelligence Directorate ("DI"), Director's Office ("DO"), the Office of Public Affairs ("OPA"), the Office of the General Counsel ("OGC"), and the Training Division ("TD").

[12]  Initially, each EC was specifically tailored to the Division or office to which it was sent. For example, the Training Division was sent only that part of the request pertaining to training materials as it was highly unlikely that it would have any information on aggregate data or assessments.  It was later discovered that each office could have records potentially responsive to more than the presumed category of records.  Therefore, a revised EC was sent to these offices seeking potentially responsive records to all portions of the request.  In many cases, for example in SCFO and SFFO, the recipients conducted more than one search of their records in response to the revised ECs.

[13]  "HUMINT" is Human Intelligence.  Records related to the FBI's training and use of informants would normally be indexed utilizing this term, rather than the previously searched term "informant."

[14]  In an effort to avoid any public confusion concerning FBI current policy, RIDS provided the current policies and all previous versions of the policies available without regard to the established search cut-off date.

aware of certain policy records mentioned within other policy manuals. RIDS located and obtained these records as well.

(50)    Further, RIDS contacted FBI personnel most likely to have knowledge of any aggregate data collected from investigations that would be responsive to plaintiffs' requests.[15] These personnel reported that information that was collected concerning investigations could not be searched in the detailed format provided by the plaintiffs in their request.

(51)    The FBI coordinates a large portion of its training through the FBI's Virtual Academy ("FBIVA"). The FBIVA is a structured, efficient electronically delivered system of training. FBIVA also tracks registration and other administrative information for traditional classroom based instruction. With the assistance of TD, RIDS compiled a list of all potentially responsive training courses listed within the system from September 2001 through March 10, 2010.[16] The FBI provided that list to the plaintiffs.[17] Plaintiffs then selected the courses they wanted RIDS to process. RIDS obtained all requested electronic courses from TD and contacted the responsible division and/or unit to obtain any selected traditional classroom based course materials.

(52)    RIDS further coordinated with CTD and learned that portions of the FBI's Muslim Cultural Training were provided by the Combating Terrorism Center ("CTC"). With the assistance of CTD, RIDS obtained copies of the cultural course materials used by the CTC for training of FBI Special Agents ("SAs").

---

[15]    The detailed aggregate data sought by plaintiffs is not data that would generally be relevant to the investigative work conducted by the FBI. Much of this information is obtained during or from prosecutions and not made a part of FBI files. FBI files are generated during an investigation, not created post conviction. In fact, much of the information sought by plaintiffs includes conviction information and other criteria, and is simply not searchable in such a format within FBI systems.

[16]    FBIVA began in January 2002. Therefore, no records prior to that date were located within FBIVA.
[17]    RIDS reviewed and redacted all exempt information from the list. Various titles and descriptions revealed FBI techniques and procedures not known to the public.

19

(53)    As the review of the responsive materials proceeded, RIDS employees contacted

operational personnel yet again to obtain their expertise and guidance in the processing of many

of the technical materials discovered.  It was during this process that RIDS became aware of

leads to additional potentially responsive records located at the FBI's Counterintelligence

Training Center ("CITC").  Consequently, an EC was circulated requesting that CITC personnel

conduct thorough searches of any documents in their possession potentially responsive to

plaintiffs' request and to respond to RMD/RIDS.  The CITC forwarded approximately 30 boxes

(approximately 40,000 pages) of records related to HUMINT and behavioral training to RIDS for

review.  RIDS reviewed these records and determined that approximately half were responsive to

the request and within the date range of the request.

### SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFFS' JULY 27, 2010 FOIA REQUEST FOR RECORDS PERTAINING TO FBI USE OF RACE AND ETHNICITY TO COLLECT AND MAP INFORMATION PERTAINING TO COMMUNITIES IN THE SAN FRANCISCO AND SACRAMENTO AREAS.

(54)    The FBI conducted its preliminary ACS index search for records using terms from

plaintiffs' request, including "racial and ethnic community demographics" and "racial and ethnic

behaviors," "racial and ethnic characteristics," "behaviors," and "cultural traditions."  These

terms are not reflective of the manner in which FBI investigative records are indexed, since the

subject matter of the plaintiffs' request is not a named individual or victim, or that of a common

investigative subject.  As a result, this initial search did not identify any responsive records.

Given the purpose, design and organization of the information stored in the CRS system, and in

light of the subject of plaintiff's FOIA request, the FBI determined that additional searches

outside of ACS were needed to locate records potentially responsive to plaintiffs' request.

Accordingly, the FBI performed an individualized search inquiry outside of the CRS system of

those FBI divisions and offices most likely to maintain potentially responsive records by issuing

an EC requesting the respective FBI division or office to search for records responsive to plaintiffs' request.

(55)    On August 20, 2010, the FBI prepared and circulated an EC to the Director's Office, DI, and OGC.[18]  The EC requested that recipients conduct thorough searches for any and all documents in their possession responsive to plaintiffs' request that were created on or after December 16, 2007 and on or before August 10, 2010.[19]

(56)    On November 16, 2010, and then again on December 6, 2010, the FBI prepared and circulated to SFFO and SCFO ECs seeking records related to plaintiffs' request.  The EC requested that the field offices and their resident agencies conduct a thorough search for any and all documents in their possession responsive to plaintiffs' request, and that were created on or after December 16, 2007 and on or before August 10, 2010.

(57)    In response to the ECs described in paragraphs 55-56 *supra*, the FBI located 597 pages of responsive records.

### ADDITIONAL SEARCH INFORMATION

(58)    During the review of responsive records, the FBI's Inspection Division began its review of cultural training materials.  This review by Inspection Division included a request to all FBI offices to provide copies of cultural training materials for review.  RIDS coordinated with the Inspection Division to ensure that all records captured by the Inspection Division during its

---

[18]  DI is responsible for the complete integration of intelligence and operations through collection, production, and dissemination of actionable intelligence, enabling the FBI to identify and counter current and emerging threats.  The Director's Office houses the Director's staff and most administrative offices including OGC and the Office of Congressional Affairs.  OGC provides comprehensive legal advice to the Director, other FBI officials, divisions, and field offices on a wide array of investigative and administrative operations and matters.

[19]  While the subjects in the March 9, 2010 FOIA request are similar to the subject of the July 27, 2010 request, the date ranges are slightly different.

review that were potentially responsive to the plaintiffs' request were provided to RIDS for

inclusion in the processing of this request. [20]

(59)     In total, over 100,000 pages were located as a result of RIDS's searches and

inquiries. RIDS's extensive search efforts touched nearly every division and unit within the FBI.

RIDS not only searched the most logical locations for responsive records, but upon learning of

other locations to search and of specific terms more likely to generate records, RIDS followed

those leads by conducting necessary additional searches.

## EXPLANATION OF *VAUGHN* FORMAT

(60)     In response to plaintiffs' multi-part FOIA request, the FBI reviewed 98,554 pages

and released 50,760 pages in full or in part. During negotiations with plaintiffs, the FBI agreed

to supply plaintiffs with sample draft narrative *Vaughn* write-ups containing preliminary

justifications for the FBI's application of Exemptions 5 U.S.C. § 552(b)(1), (b)(2), (b)(3), (b)(5),

(b)(7)(A), (b)(7)(D), (b)(7)(E), and (b)(7)(F). [21]   The purpose of providing these draft narrative

*Vaughn* write-ups was to focus the efforts of all parties on the items of most contention, and limit

the scope of the litigation going forward. At the May 2013 case management conference, the

parties discussed using a sampling methodology rather than indexing all responsive pages.

Subsequent to the conference, the parties agreed upon a multi-part sampling methodology.

Pursuant to the agreement of the parties, documents were indexed at a rate of 500 pages per

month until complete. For the first portion, plaintiffs provided a chart of their selections for

*Vaughn* indexing. For the second portion of the sampling, the FBI indexed every withheld in full

---

[20]   This coordination included sending two RIDS personnel to the FBIHQ Inspection Division for several days to conduct an item-by-item review of all documents it had received in response to its training review. The RIDS employees made a determination on the materials. The Inspection Division made available to RIDS all records identified as potentially responsive to the plaintiffs' requests.

[21]   At the stage where the FBI began providing the draft narrative *Vaughn* write-ups, plaintiffs had advised that they were not contesting any Exemption (b)(4), (b)(6), or (b)(7)(C) withholdings.

document located at each 500th page.  For the third and final portion of the sampling, the FBI

selected documents located at 1,000 page intervals.  The FBI then prepared draft narrative

*Vaughn* write-ups to provide detailed, document-by-document descriptions of the types of

documents within the sample and the redactions applied within these sample documents.

Through its efforts to address plaintiffs' concerns over the redaction of material within the

responsive documents, the FBI provided draft narrative *Vaughn* write-ups for a total of 3,659

pages, thus exceeding the sample of 2.5% of the total 98,554 pages at issue originally suggested

by the magistrate judge during the case management conference.

(61)    Upon reviewing the FBI's draft narrative *Vaughn* write-ups, plaintiffs advised the

FBI that they would not contest any Exemption (b)(1) redactions/withholdings.  Plaintiffs still

challenge the FBI's withholding of information pursuant to Exemptions (b)(2), (b)(3), (b)(5),

(b)(7)(A), (b)(7)(D), (b)(7)(E), and (b)(7)(F), herein described as the contested Exemptions.[22]

(62)    In providing the sample draft narrative *Vaughn* write-ups during negotiations with

plaintiffs, the FBI expended a vast amount of time and resources to articulate in detail its

reasoning for withholding information in the documents at issue, with an eye towards filing the

drafts as exhibits if negotiations were not successful.  As such, the FBI herein provides plaintiffs

and the Court with the compilation of the FBI's narrative *Vaughn* write-ups in final form as an

exhibit for review.  Only minor edits have been made to the previous draft versions provided to

plaintiffs.  (**See Exhibit II.**)

(63)    For the ease of the Court and plaintiffs, the FBI has provided an additional

"Narrative *Vaughn* Reference Index" to aid in navigating through Exhibit II.  This narrative

*Vaughn* Reference Index provides what essentially amounts to a table of contents, in chart

---

[22] Within the chosen sample pages, there were no instances where information had been redacted pursuant
to Exemption (b)(3) or (b)(7)(F).

format, for all of the FBI's redaction justifications for the contested Exemptions within Exhibit

II.  (**See** **Exhibit JJ.**)

**Explanation of the FBI's Narrative *Vaughn* Reference Index**

(64)      Exhibit II separates all of the FBI's redaction justifications, for the contested

Exemptions, by Exemption and then further separates them into several categories and sub-

categories, depending on the subject matter of the documents in which the Exemptions were

applied.  These subject matter categories and sub-categories are based upon the categories of

information requested by plaintiff, *i.e.* FBI domain management documents, training documents,

policy documents, *etc.*  Below are the contested Exemption categories in Exhibit II, along with

their specific categories and sub-categories:

- **FOIA EXEMPTION (b)(2)**
  - **(b)(2) CATEGORY I – FBI TRAINING MATERIALS**
    - **(b)(2) Sub-Category I.A. – CHS Training**
    - **(b)(2) Sub-Category I.B. – Policy Training**
- **FOIA EXEMPTION (b)(5)**
  - **(b)(5) CATEGORY I – FBI TRAINING MATERIALS**
    - **(b)(5) Sub-Category I.A. – Cultural/Behavioral Analysis Training**
    - **(b)(5) Sub-Category I.B. – Policy Training**
  - **(b)(5) CATEGORY II – FBI POLICY DOCUMENTS**
- **FOIA EXEMPTION (b)(7)(A)**
  - **(b)(7)(A) CATEGORY I – FBI TRAINING MATERIALS**
    - **(b)(7)(A) Sub-Category I.A. – Domain Management/Assessment Training**

- **(b)(7)(A) Sub-Category I.B. – Cultural/Behavioral Analysis Training**

- **(b)(7)(A) Sub-Category I.C. – CHS Training**

  - **(b)(7)(A) CATEGORY II – DOMAIN MANAGEMENT/ASSESSMENT DOCUMENTS**

- **FOIA EXEMPTION (b)(7)(D)**

  - **(b)(7)(D) CATEGORY I – DOMAIN MANAGEMENT/ASSESSMENT DOCUMENTS**

  - **(b)(7)(D) CATEGORY II – FBI TRAINING MATERIALS**

    - **(b)(7)(D) Sub-Category I.A. – Domain Management/Assessment Training**

    - **(b)(7)(D) Sub-Category I.B. – Cultural/Behavioral Analysis Training**

    - **(b)(7)(D) Sub-Category I.C. – CHS Training**

- **FOIA EXEMPTION (b)(7)(E)**

  - **(b)(7)(E) CATEGORY I – FBI TRAINING MATERIALS**

    - **(b)(7)(E) Sub-Category I.A. – Domain Management/Assessment Training**

    - **(b)(7)(E) Sub-Category I.B. – Policy Training**

    - **(b)(7)(E) Sub-Category I.C. – CHS Training**

    - **(b)(7)(E) Sub-Category I.D. – Cultural/Behavioral Analysis Training**

  - **(b)(7)(E) CATEGORY II – DOMAIN MANAGEMENT/ASSESSMENT DOCUMENTS**

  - **(b)(7)(E) CATEGORY III – POLICY DOCUMENTS**

(65)    Within the narrative *Vaughn* Reference Index chart, there are three columns.  The first column from the left provides a brief explanation of individual Exemption justifications for

different redactions, within different categories and sub-categories of document types. The second column provides the pages numbers of the narrative *Vaughn* Reference Index where these specific justifications can be found. The final column provides the *Bates* page numbers for where these Exemption Justifications were applied, within the sampled documents which were consecutively *Bates* numbered MC-1 through MC-3665.[23]

## EXPLANATION OF THE CONTESTED FOIA EXEMPTIONS

(66)     Below are basic explanations of the applied Exemptions (including any threshold issues) and brief explanations of the different contested Exemptions. This portion of the declaration only serves to introduce the different Exemptions being contested and the FBI's legal basis for applying the redactions based on these Exemptions. For further, detailed explanations of the FBI's redaction justifications, please reference **Exhibits II and JJ.**

## EXEMPTION (b)(2) – INTERNAL PERSONNEL INFORMATION

(67)     Following the Supreme Court's decision in <u>Milner v. Department of Navy</u>, 131 S. Ct. 1259 (2011), the application of Exemption (b)(2) was narrowed to the withholding of government records which relate to employee relations and human resources issues. In its ruling, the Supreme Court clarified that in order to determine whether information is exempt pursuant to (b)(2): 1) the information needs to be related to an agency's personnel rules and practices; 2) the information must relate solely to these rules and practices; and 3) the information must be internal, meaning the agency typically keeps this information to itself for its own use.

(68)     When the FBI first began processing documents for release to plaintiffs, it applied Exemption (b)(2) as it had been historically applied prior to the <u>Milner</u> decision. The majority of information to which the FBI originally applied (b)(2) is no longer exempt pursuant to (b)(2) as it

---

[23] Due to the volume of pages included in the FBI's sample, the FBI has not filed the sample documents with its declaration; however, the FBI has provided these pages to plaintiffs and can make them available to the court, upon request.

does not meet the Supreme Court's test in <u>Milner</u>. However, in all instances where (b)(2) no longer applies, (b)(2) was applied in conjunction with (b)(7)(E). As (b)(7)(E) is still applicable in these instances, the narrowing of (b)(2) did not result in the release of additional information.

(69)     In the instances in the sample documents where the FBI is defending its application of (b)(2), the FBI has determined that this redacted information relates solely to the FBI's internal personnel rules and practices and has not been released outside of the FBI. Therefore, this information meets the requirements of the Supreme Court's three-part test and remains exempt pursuant to FOIA Exemption (b)(2).

## EXEMPTION (b)(5) – PRIVILEGED INFORMATION

(70)     FOIA Exemption (b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption has been construed to exempt those documents or information normally privileged in the civil discovery context, including, as is the case here, the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege.

(71)     Within the sample documents, the FBI has asserted (b)(5) to protect confidential communications between clients seeking legal advice from professional legal advisers in their capacities as lawyers, pursuant to the attorney-client privilege. It has asserted (b)(5) to protect the internal deliberations of government employees – *i.e.*, recommendations, analyses, opinions, and other non-factual information comprising the decision-making process – pursuant to the deliberative process privilege. It has also asserted (b)(5) to protect documents and information prepared by or for attorneys in reasonable anticipation of litigation, pursuant to the attorney work-product privilege. In all of these instances where Exemption (b)(5) has been asserted, the

FBI has ascertained that all redacted information is inter- or intra-agency and privileged, and that it should remain confidential.

## EXEMPTION (b)(7) THRESHOLD

(72)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 U.S.C. §§ 533 and 534, and Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, all of the responsive records addressed herein were compiled for the following specific law enforcement purposes and squarely fall within the law enforcement duties of the FBI:

- Criminal Investigations/Intelligence Gathering Efforts – Numerous documents responsive to plaintiffs' requests were created during and/or summarize FBI criminal investigations and intelligence gathering efforts. These records were created to further the FBI's investigative efforts or intelligence mission of predicting and/or preventing threats to the national security of the United States and its citizens.

- Support/Assistance to State and Local Law Enforcement – Numerous documents responsive to plaintiffs' requests were complied for the purpose of assisting the FBI's state and local law enforcement partners. As prescribed by AGG-DOM, paragraph III.C., the FBI may provide investigative assistance to state, local, and tribal

enforcement agencies "in the investigation of matters that may involve federal crimes
or threats to the national security, or for such other purposes as may be legally
authorized."

- Functional Purpose of Developing or Implementing Techniques, Procedures, and/or
  Guidelines - Numerous documents responsive to plaintiffs' requests were complied
  for the purpose of enhancing the FBI's ability to perform its law enforcement,
  national security, and intelligence missions.  To accomplish these missions, certain
  tasks and operational functions are required, to include the identification,
  development, and implementation of law enforcement and intelligence gathering
  methods, techniques, procedures, and guidelines.  Documents at issue in this litigation
  that serve this purpose include training material and agency policy guidelines.

## EXEMPTION (b)(7)(A)
## PENDING LAW ENFORCEMENT PROCEEDINGS

(73)     Exemption (b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information...could
> reasonably be expected to interfere with enforcement proceedings.

5 U.S.C. § 552(b)(7)(A).

(74)     Application of this exemption requires: the existence of law enforcement records;
a pending or prospective law enforcement proceeding; and a determination that release of the
information could reasonably be expected to interfere with the enforcement proceedings.  In
evaluating FBI information for withholding pursuant to Exemption (b)(7)(A), RIDS endeavored
to ensure that the information withheld met these parameters.  To do this, RIDS confirmed with
FBI personnel engaged in pending law enforcement/intelligence gathering matters that the
information redacted pursuant to Exemption (b)(7)(A) was associated with pending law

enforcement/intelligence gathering matters and release would jeopardize the investigations.[24] By protecting only the information meeting these qualifications, the FBI was able to release the most amount of information to plaintiffs, without jeopardizing the outcome of pending FBI law enforcement procedures.

### EXEMPTION (b)(7)(D) – CONFIDENTIAL SOURCE INFORMATION

(75)   FOIA Exemption (b)(7)(D) protects:

> records or information compiled for law enforcement purposes
> [when disclosure] could reasonably be expected to disclose the
> identity of a confidential source, including a state, local or foreign
> agency or authority or any private institution which furnished
> information on a confidential basis, and, in the case of a record or
> information compiled by a criminal law enforcement authority in
> the course of a criminal investigation or by an agency conducting a
> lawful national security intelligence investigation, information
> furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

(76)   Numerous confidential sources report to the FBI on a regular basis and are "informants" within the common meaning of the term; these sources provide information under an express assurance of confidentiality. Still other individuals are interviewed under circumstances from which an assurance of confidentiality can reasonably be inferred. These individuals are considered to be confidential sources because they furnished information only with the understanding that their identities and the information provided would not be released outside the FBI. Information provided by these individuals is singular in nature, and if released, could reveal their identity. Revealing the identity of - and information provided by – these

---

[24] For example, RIDS checked the status of each responsive serial in ACS and then communicated directly with operational personnel familiar with the material to confirm that it was related to a pending enforcement proceeding and that its release would adversely affect that proceeding. RIDS further confirmed these determinations through consultations with the Office of the Chief Division Counsel in the relevant Field Office. Moreover, if investigations were mentioned in training materials, RIDS contacted the Special Agents assigned to those investigations to make determinations about pending status and adverse impact.

sources would have a chilling effect on the activities and cooperation of these and other future FBI confidential sources.

(77)     Within the sample documents, the FBI applied (b)(7)(D) to protect information from and the identities of sources who provided information under express assurances of confidentiality. In these instances, there existed evidence of an agreement with these individuals that the FBI would not disclose their identities or the information they provided.

(78)     The FBI also determined that in some instances where express assurances were not evident, individuals and some local law enforcement agencies/personnel provided information to the FBI under circumstances demonstrating that they expected their association with the FBI and the information they provided would remain confidential. In these instances, it was clear to the FBI that release of these individuals'/agencies' associations with the FBI and/or discretionary release of the information they provided could subject them to some sort of detriment or reprisal. This could include violence, physical or economic harm, and/or public embarrassment. Specifically in the case of local law enforcement agencies and personnel, releasing information they provided could mean loss of public trust and could also impede their ability to perform their law enforcement duties. With such threats so apparent, the FBI determined that these individuals/agencies would not have provided such information to the FBI without expectations that the FBI would not reveal their identities and the information they provided. Thus, the FBI applied (b)(7)(D) to protect these individuals'/agencies' identities and the information they provided.

### EXEMPTION (b)(7)(E) – INVESTIGATIVE TECHNIQUES AND PROCEDURES

(79)     Exemption (b)(7)(E) protects records or information compiled for law enforcement purposes when release "would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(80)   Within the sample documents and a majority of the documents responsive to plaintiffs' requests overall, Exemption (b)(7)(E) has been applied to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement and intelligence gathering missions, and also to non-public details about techniques and procedures that are otherwise  known to the public. As a law enforcement and intelligence gathering agency, the FBI relies on numerous non-public techniques and methods to prevent and detect crime and threats to the national security of the United States. The effectiveness of these techniques and methods often hinges on the FBI's tactical advantage of being unpredictable and/or operating undetected by criminals. Release of this type of information would expose these strategies, techniques and methods, and deprive the FBI of any such tactical advantage against criminals and terrorists. Thus, release of this information presents a serious threat of law enforcement circumvention.

(81)   When determining whether (b)(7)(E) applied to information within the responsive documents, the FBI made great efforts to determine whether information proposed for redaction had been publicly released. This often entailed searching through public source material and seeking out FBI personnel with institutional knowledge of the information in question. Throughout the production of records to plaintiffs, the FBI only protected information pursuant

to Exemption (b)(7)(E) when it determined such information was not known by the general public.

(82)    Once information proposed for redaction under (b)(7)(E) was determined to be non-public, the FBI further analyzed the material to determine whether there was an actual threat of law enforcement circumvention if the information were released.  In trying to determine such threats, employees reviewing documents for release continually sought the expertise of operational personnel, throughout the FBI.  These operational personnel on the front lines of preventing/investigating crimes and threats to national security, provided critical determinations of whether information was sensitive and needed to be withheld to safeguard techniques and procedures.  This process allowed RIDS to release the maximum amount of information to plaintiffs, without undermining the FBI's law enforcement, national security, and intelligence gathering missions.

## SEGREGABILITY

(83)    Plaintiffs have been provided all non-exempt records or portions thereof that are responsive to their FOIA requests to the FBI.  During the processing of plaintiffs' requests, each responsive page was individually examined to identify non-exempt information that could be reasonably segregated from exempt information for release.  All segregable information has been released to plaintiffs.  As demonstrated herein, the only information withheld by the FBI consists of information that would trigger reasonably foreseeable harm to one or more interests protected by the cited FOIA exemptions.

(84)    As discussed in paragraph 60 *supra*, there were 98,554 responsive pages identified:  50,760 pages Released in Full ("RIF") or Released in Part ("RIP"), and 47,794 Withheld in Full ("WIF") per applicable FOIA Exemptions or because they were deemed to be

33

duplicative of other pages released to plaintiffs. Each of these categories is discussed below to further address segregability.

    (a) <u>Pages RIF and RIP</u>: Following the segregability review, RIDs determined that 50,760 pages could be released in full or in part. With the RIF pages, the FBI found there was no foreseeable harm to an interest protected by a FOIA exemption. With the RIP pages, RIDs determined that these pages could be released in part with redactions per the identified FOIA Exemptions. These pages comprise a mixture of material that could be segregated for release and material that was withheld because release would trigger foreseeable harm to one or more interests protected by the cited FOIA Exemptions on these pages.

    (b) <u>Pages WIF</u>: Following the segregability review, RIDs determined that it had to withhold 47,794 pages in their entireties. Regarding the pages WIF based on applicable FOIA Exemptions, RIDs determined that all information on these pages was either fully covered by one or more of the cited FOIA exemptions, or determined that any non-exempt information on these pages was so intertwined with exempt material that no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce at most disjointed words, phrases, or sentences that taken separately or together would have minimal or no informational content. Regarding the pages WIF as duplicates, RIDS determined that these pages were duplicative of other pages released to plaintiff. In order to provide consistent, timely, and efficient responses to FOIA requests, it is the FBI's practice not to process duplicates.

## CONCLUSION

(85)    The FBI's search efforts in this case were extensive and certainly reasonably calculated to locate records responsive to plaintiffs' requests.  The FBI has processed and released all reasonably segregable information from the records located as the result of its thorough, wide-ranging search efforts.  In its Exemption justifications for redacting information in the representative sample documents,  the FBI has demonstrated that within all of the records released to plaintiff,  information has been properly withheld pursuant to the contested FOIA Exemptions (b)(2), (b)(5), (b)(7)(A), (b)(7)(D) and (b)(7)(E).  The FBI has carefully examined the responsive records and has determined that the information withheld from plaintiff, if disclosed, would reveal:  internal personnel related information; privileged information; the identities and/or information provided by confidential informants; and investigative techniques and procedures for law enforcement investigations, the disclosure of which could reasonably be expected to risk circumvention of the law.  The FBI has determined that there is no further reasonably segregable information to be released.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A-JJ attached hereto are true and correct copies.

Executed this _____ day of September 2014.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

35