UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE AMERICAN CIVIL LIBERTIES UNION OF NORTH CALIFORNIA, et al.,

Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION,

Defendant.

Case No. 10-cv-03759-RS

**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Plaintiffs the American Civil Liberties Union of Northern California, the Asian Law Caucus, and the San Francisco Bay Guardian filed this action, averring that the Federal Bureau of Investigations has improperly withheld or redacted documents in violation of the Freedom of Information Act, 5 U.S.C. § 552 (2012). In 2010, the Plaintiffs filed two FOIA requests, seeking documents relating to the FBI's alleged surveillance activities of Muslim and other ethnic and racial groups in Northern California. The FBI has produced responsive documents and an index describing the documents withheld or redacted and explaining why the documents are not subject to disclosure.

Having failed to demonstrate that 5 U.S.C. § 522(b)(7)—Exemption 7—justifies withholding and redaction of the documents that Plaintiffs seek, the FBI now asserts that it has properly withheld and redacted documents pursuant to 5 U.S.C. § 522(b)(5) (Exemption 5). That

exemption shields from disclosure documents and information covered by the attorney-client and deliberative-process privileges. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 979 (9th Cir. 2009) (internal quotation marks omitted) (deliberative-process privilege); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975) (attorney-client privilege). Plaintiffs contest the applicability of Exemption 5 to three categories of documents:  Human Source Advisory Notices, Frequently Asked Questions for Threat Assessments, and Draft Training FAQs.  At issue now is (1) whether attorney-client privilege relieves the FBI of its obligation to produce the Human Source Advisory Notices; (2) whether attorney-client privilege applies to the entirety of the FAQs for Threat Assessments, or whether portions can be redacted; and (3) whether the deliberative-process privilege exempts from production the draft training FAQs.  After the hearing, the FBI submitted the Human Source Advisory Notices for *in camera* review.

In general, the Human Source Advisory Notices do not contain communications protected by attorney-client privilege with one exception.  One email dated November 26, 2003,[1] contains detailed communications about an ongoing investigation, rather than generalized policy statements.  Accordingly, Exception 5 exempts from disclosure the redacted portion of that email.  The FBI's evidence is insufficiently specific to determine that attorney-client privilege applies to the withheld or redacted information, and therefore the FBI has not established that the FAQs are exempt from disclosure.  Because the FBI has conceded that the draft training FAQs were not predecisional and has not demonstrated that disclosure of the document would discourage frank deliberation, the FBI may not use the deliberative-process privilege to withhold the draft training FAQs.

## II. BACKGROUND

Upon hearing reports that the FBI had been surveilling certain ethnic and religious communities in Northern California, Plaintiffs became concerned that the FBI's practices were impacting the civil liberties of those groups' members.  In order to assess the impact of the FBI's surveillance practices on the civil liberties of the targeted groups, Plaintiffs filed two FOIA

---

[1] The document is Bates-stamped "MC-1396."

requests with the FBI. The first request sought records pertaining to the FBI's policies and practices as to the use of informants; assessment practices; legal justifications for the investigations and assessments; training materials regarding Islam, Muslim culture, and Muslim, Arab, South Asian, and Middle Eastern communities; use of race, religion, ethnicity, language, or national origin for law-enforcement purposes; the FBI Citizenship Academy; the FBI Junior Agent Program; and domain management. Plaintiffs also requested records concerning the FBI's investigation of mosques, Islamic centers, Muslim community centers, mosque members, Muslim leaders, and imams; and the targets and outcomes of law-enforcement activity in Northern California in comparison with the rest of the country.

Later, Plaintiffs filed a second FOIA request, seeking records pertaining to the FBI's attempts to map racial and ethnic demographics, behaviors, and lifestyle characteristics. Included among the FBI's policies and procedures that Plaintiffs sought were those regarding the type of racial and ethnic information the FBI can collect; the collection of information and mapping of ethnic businesses or facilities; the behavioral characteristics that the Domestic Investigations and Operations Guide ("DIOG") classifies as "associated with a particular criminal or terrorist element of an ethnic community"; and how the FBI used the collected racial and ethnic data. Plaintiffs also demanded information about the data that the FBI collected and the maps that the FBI created; the number of communities in Northern California that the FBI targeted; and descriptions of the maps of Northern-Californian racial and ethnic communities.

The FBI did not produce the documents requested initially within the time period prescribed by statute, and so Plaintiffs commenced this action. When the FBI did not disclose the documents sought in Plaintiffs' second FOIA request, Plaintiffs amended their complaint to incorporate a second FOIA claim. The parties mediated with the assistance of a magistrate judge and agreed on a production schedule for the release of the remaining responsive documents. Since that time, the FBI has released over 50,000 full or redacted pages of responsive records and withheld approximately 47,794 records on the ground that those records are exempt from FOIA's production requirements. To facilitate litigation about the applicability of the FOIA exemptions, the parties agreed to provide Plaintiffs with descriptions of the withheld responsive documents and

detailed justifications for the application of the exemption. *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

After Plaintiffs reviewed the FBI's *Vaughn* indexes, they agreed not to challenge the FBI's application of Exemptions 1, 3, 4, 6, 8, and 9, but reserved the right to challenge other exemptions and the adequacy of the FBI's *Vaughn* write-ups. The parties filed cross motions for summary judgment regarding the propriety of the FBI's decision to withhold certain documents; the sufficiency of the FBI's descriptions of the withheld and redacted materials; and the adequacy of the FBI's explanations for withholding and redacting certain materials under 5 U.S.C. § 552(b)(7) ("Exemption 7"). In March 2015, this Court agreed with Plaintiffs: the FBI may no longer employ Exemption 7 to withhold documents because the FBI has not demonstrated that there is a "rational nexus" between the particular documents withheld and the FBI's law-enforcement activities.

Following the order regarding Exemption 7, the FBI filed a supplemental brief in support of summary judgment, asserting that Exemptions 2 and 5 apply to certain information and documents. 5 U.S.C. § 522(b)(2) ("Exemption 2), exempts from disclosure "matters that are . . . related solely to the internal personnel rules and practices of an agency," and therefore permits the withholding of the minimum passing test scores required in order for FBI employees to pass two internal web-based tests. Plaintiffs do not contest the applicability of Exemption 2 to these materials. Further, at this juncture, Plaintiffs do not challenge the FBI's redaction of portions of the Electronic Communication on Intelligence Oversight Board Matters, but reserves the right to challenge the redactions to this document after the FBI produces it. Pls.' Resp. to FBI's Suppl. Br. at 9. The sole issue presently pending therefore is whether Exemption 5 applies to three categories of documents and redactions: Human Source Advisory Notices; Frequently Asked Questions for Threat Assessments, and Draft Training FAQs. Both parties move for summary judgment on that question.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

The parties do not claim that there is a dispute of material fact, as is often true in FOIA cases. *See Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996). To determine which party is entitled to summary judgment, the first step is to determine whether the FBI has met its burden of showing that it has discharged fully its FOIA obligations. *Shannan v. I.R.S.*, 637 F. Supp. 2d 902, 912 (W.D. Wash. 2009). Next, the FBI has the burden of demonstrating that the undisclosed information falls within one of the nine FOIA exemptions. *Id.* The final step is to determine whether the FBI has satisfied its burden of establishing that "all reasonable segregable portions of the document[s] have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008); 5 U.S.C. § 522(a)(4)(B), (b). At this juncture, Plaintiffs do not dispute that the FBI has discharged adequately its FOIA obligations, nor do the parties address the segregability questions. Their dispute is therefore limited to whether the FBI's invocation of Exemption 5 is proper.

"FOIA 'was enacted to facilitate public access to Government documents.'" *Lahr*, 569 F.3d at 973 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). Congress designed FOIA "to pierce the veil of administrative secrecy and open agency action to the light of public scrutiny." *Ray*, 502 U.S. at 173 (internal quotation marks omitted). Consequently, there is a "strong presumption in favor of disclosure," *id.*, and "exemptions should be interpreted narrowly," *Lahr*, 569 F.3d at 973 (internal quotation marks omitted).

## IV.   DISCUSSION

FOIA does not require that the FBI disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 522(b)(5). "Exemption 5 shields those documents, and only those documents, normally privileged in the civil discovery context," including documents covered by attorney-client and deliberative-process privileges. *Lahr*, 569 F.3d at 979 (internal quotation marks omitted) (deliberative-process privilege); *see also Sears*, 421 U.S. at 154 (attorney-client privilege).

### A. Attorney-Client Privilege

"The attorney-client privilege protects confidential communications from clients to their

5

attorneys made for the purpose of securing legal advice or services" and "communications from attorneys to their clients" to the extent that "the communications rest on confidential information obtained from the client." *Tax Analysts v. Internal Revenue Servs.*, 117 F.3d 607, 618 (D.C. Cir. 1997) (internal citation and quotation marks omitted). Thus, between FBI officials and the Bureau's lawyers communications are privileged if they contain information communicated by the attorney in confidence for the purpose of obtaining legal advice, the attorney was acting in her capacity as a lawyer, the communications were related to the purpose of obtaining legal advice, and the FBI did not waive attorney-client protection. *See United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). "The privilege does not exempt a document from disclosure simply because the communication involves the government's counsel." *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 584 F. Supp. 2d 65, 79 (D.D.C. 2008) (internal quotation marks omitted). "The privilege protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege" and "confidential information that involves or is about that client." *Id.* at 79.

### 1. Human Source Advisory Notices

The FBI has produced Human Source Advisory Notices with significant redactions that render the documents unreadable. *See* R. 141-1, Kleine Decl. Ex. A. According to these documents, the FBI distributes these advisory notices to numerous FBI listservs and "investigative and administrative personnel." *Id.* at 5. There are two parts to each advisory notice: a notice section and a policy section. *See, e.g.*, *id.* at 18. For the most part, the substance of both of these sections is redacted. In the *Vaughn* index, the FBI explains that the redacted portions "contain[] specific legal and procedural advice, including approval levels and requirements, interpretation of law, source coordination and liaison with other agencies, and information on specific operational techniques for operating sources—which are currently used in cases today." R. 139-1 at 5, 2d Suppl. Hardy Decl. Ex. II. The FBI contends that the advisory notices include "scenarios" that "stem[] from questions raised to FBI Counsel on actual cases as to when particular investigative techniques should be utilized." *Id.* After the hearing on this matter, the FBI submitted unredacted copies of the Human Advisory Notices for *in camera* review.

The bulk of the redacted portions of the Human Advisory Notices do not include communications to the FBI's attorneys "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C.Cir.2007) (internal quotation marks omitted). The notice section of the Advisory Notices contains a short description of a situation agents may encounter in the field. The descriptions are general and lack any specific information. The policy section provides a citation to an FBI policy and brief analysis applying the language of the policy to the situation described in the notice section. While the FBI attests that the substance of the Advisory Notices "stem[] from questions raised to FBI Counsel," the Advisory Notices "are more akin to a 'resource' opinion about the applicability of existing policy to a certain state of facts, like examples in a manual, to be contrasted to a factual or strategic advice giving opinion." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).

Only page MC-1396 of the submitted materials falls into the category of attorney-client privileged communications. Unlike the generic descriptions in the Human Advisory Notices, this email contains details about an asset, the assets location, and the reason for the communication. This email is less like a resource opinion and contains fact-specific advice and communications, and therefore Exemption 5 excludes from disclosure the redacted portions of the email.

Second, with the exception of page MC-1396, the FBI has not submitted evidence that substantiates its claim that the communications were confidential in fact. Indeed, the wide distribution of the Advisory Notices to all administrative and investigative personnel implies the contrary. *See Nat'l Sec. Counselors*, 960 F. Supp. 2d at 194. Moreover, "[w]here a client is an organization, including a government organization, the privilege extends 'no further than among those members of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'" *Shurtleff v. United States Envtl. Prot. Agency*, 991 F. Supp. 2d 1, 16 (D.D.C. 2013) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)). The FBI has not submitted evidence to establish that the people who received the Advisory Notices were authorized to speak or act on behalf of the FBI.

7

The FBI has failed to establish, with the exception cited above, that the redacted portions of the Advisory Notices include attorney-client-privileged information. Accordingly, the FBI's motion for summary judgment is denied. The FBI shall produce unredacted copies of the Human Advisory Notices except document MC-1396.

### 2. FAQ for Threat Assessments

The FBI has withheld entirely the FAQs for Threat Assessments. According to the FBI, the FAQs advise FBI personnel about how to apply FBI policy to threat assessments. To justify withholding the FAQs, the FBI states that these FAQs "encompass opinions given by" and "consist[] of specific policy and procedural applications, advice, and guidance vetted through and/or from" the FBI attorneys to FBI employees. R. 139-1 at 19, 2d Suppl. Hardy Decl. Ex. II. The remainder of the entry in the *Vaughn* index concerning the FAQs merely defines attorney-client privilege and asserts without more that it applies to this information without citing specific facts. *See id.* at 19-20.

The FBI has failed to establish that attorney-client privilege shields the entirety of the FAQs from disclosure for many of the same reasons the FBI failed to carry its burden with respect to the redacted portions of the Advisory Notices. First, the FBI's evidence does not substantiate the need to withhold the FAQs in their entirety because some portions of the document do not appear to contain legal advice or confidential communications. Second, the FBI has not provided sufficient information to determine whether the FAQs consist of advice about specific legal questions and situations, or whether they clarify broadly applicable FBI policies. Finally, the FBI has not provided information about who receives the FAQs and whether the recipients are authorized to speak and act on behalf of the FBI. Thus, the FBI must produce the segregable portions of the FAQs or provide more information about which portions contain attorney-client-privileged information.

### B. Deliberative-Process Privilege

The final document at issue is the FBI's draft training FAQs, which the FBI asserts is shielded from disclosure by the deliberative-process privilege. That privilege shields from disclosure "documents reflecting advisory opinions, recommendations and deliberations

comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (internal quotation marks omitted). To fall within the ambit of the deliberative-process privilege, the FBI must demonstrate that the document is both "predecisional" and "deliberative." *Lahr*, 569 F.3d at 979. "A document is predecisional if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotation marks omitted). Documents that "reflect[] the give-and-take of the consultative process" are deliberative. *Id.* (internal quotation marks omitted). Because the purpose of the privilege is to "protect[] open and frank discussion among" employees of an agency who make decisions, *Klamath Water*, 532 U.S. at 9, "the key question in Exemption 5 cases is whether the disclosure of materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions," *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1090 (9th Cir. 2002) (internal quotation marks and alteration omitted).

According to the FBI, the draft FAQ exists in electronic form and consists of redline comments concerning the substance and format of the document. R. 139 at 6, 2d Suppl. Hardy Decl. ¶ 11. David Hardy, the FBI's Record/Information Dissemination Section Chief, attests that the FBI could not locate a "final" version of the document. *Id.* Hardy asserts in conclusory fashion that the document "reflects the give-and-take process" and would chill future drafters of similar documents from offering comments about the substance and format of the document. *See id.* The FBI has not, however, offered specific, non-conclusory information about how the drafters' comments contributed or informed the decisionmaking process. More importantly, the FBI concedes that the redline comments do not reflect debate about which policies apply or should be adopted. FBI Reply Br. at 3. Instead, the FBI contends that the document is deliberative because the redline comments reflect debate about "how to instruct or convey" the policies to FBI special agents. *Id.* In other words, the FBI asserts that it has decided what to say, just not how to say it.

9

1    The deliberative-process privilege does apply, however, to documents that "explain[] . . . a
2    decision already reached or a policy already adopted." *Sears*, 421 U.S. at 153 n.19. The FBI has
3    not contended that the draft FAQs include such quintessentially deliberative content as advice
4    about whether to adopt or reject a policy. Nothing in the FBI's evidence suggests that advice
5    about whether a comma should be inserted, word choice, or phrasing would discourage members
6    of the Bureau from providing candid advice about the pros and cons of adopting a policy or
7    practice. Thus, the FBI has all but admitted that the document reflects a policy it has adopted, and
8    therefore constitutes the FBI's "working law." *See id.* at 152-53. "Working law" is not exempt
9    from disclosure. *Id.* The FBI must therefore produce the draft FAQs.

### V.   CONCLUSION

The FBI has not carried its burden to demonstrate that Exemption 5 justifies redactions of the Human Source Advisory Notices, or the complete withholding of the FAQs for Threat Assessments and the draft training FAQs. Accordingly, the FBI has thirty (30) days from the date of this order to produce unredacted copies of the Human Advisory Notices, the FAQs for Threat Assessments and draft training FAQs. The redacted portions of page MC-1396 are exempt from disclosure.

**IT IS SO ORDERED.**

Dated: November 17, 2015

RICHARD SEEBORG
United States District Judge